## PUTNAM et al. v. SWEET et al.

1. INJUNCTION—PARTIES.—Where two separate and distinct parties are acting in the accomplishment of a measure injurious to others who have rights in the same matter, though they may be acting separately and without concert to carry their plan into effect, all the parties so acting may be joined in a bill by the aggrieved party as defendants, and an objection by demurrer on account of such alleged misjoinder will not be sustained.

2. CORPORATION—EQUITY.—Though it may be necessary, in proceedings against a corporation, to oust it of its jurisdiction and franchises, for the proper officer of the state to be the actor, by information or *quo warranto*, yet where one or more have obtained, through fraud, the possession of a corporation created by law, and assume to exercise its functions, and are possessed of its franchises, the court will entertain a bill, filed by parties aggrieved by such an act, as a matter of private right; and where such possession has been acquired by means of the process of a court fraudulently used, and after the acquirements of the franchise by means thereof, it is abandoned, a bill filed by the aggrieved parties will be entertained to annul all that had been accomplished by the improper use of the process of the court, and the parties will be placed *in statu quo*.

3. SAME—PARTIES.—Where the process of a court has been perverted and abused, it will vindicate itself by undoing all that was done by such wrongful application of its power. But where a corporation is *in esse*, in fact, it is necessary that the corporation should be a party in a suit to oust those who are alleged to have fraudulently possessed themselves of its franchises; and it is erroneous to dismiss a bill filed where the corporation should have been made a party. In such a case, leave to amend should be granted.

4. SAME.—It is competent for any number of persons who have an interest in the stock of a corporation, to file a bill in behalf of themselves and all others standing in like condition, though all are not participants in filing such bill.

(1 *Chand.* 286.)

APPEAL from the Circuit Court for *Washington* County.

This was an appeal from an order sustaining a general demurrer, interposed by a part of the defendants to the complainants' bill, and the complainants appealed.

The bill purported on its face to have been filed by the complainants, who are named therein as such, and in the behalf

and for the benefit of themselves and all others, *bona fide* subscribers to the capital stock of the Milwaukee and Janesville plank road company, chartered by the territorial legislature by an act approved March 6, 1848.

The commissioners appointed for the distribution of the stock of the company to subscribers, were *Levi Blossom*, Aaron Putnam, Emery Thayer, *Thomas P. Williams*, A. Hyatt Smith and Timothy Jackman; and by the provisions of the act, after one thousand shares of the stock should have been subscribed, and the money, to wit: one dollar on each share should have been actually paid to the commissioners, the subscribers and others, their associates, were declared a body politic and corporate, and upon twenty days' notice, by the commissioners, the stockholders were empowered to elect directors of the company; that until the directors were chosen, the commissioners had power, by the act, to issue certificates of stock to subscribers, and to act themselves as directors; that in June, 1848, the commissioners opened the books of subscription, and kept them open to subscribers for a considerable time, and that but small subscriptions were made until December thereafter.

That in consequence of the reluctance of persons to make subscriptions, one or more meetings were called of the citizens of Milwaukee, touching and relating to the importance of taking the stock and building the road, at which meetings the defendants, *Blossom, Sweet*, and others of the defendants, attended and participated in the proceedings. That at such meetings fears were expressed by some, that some person or persons might acquire by their subscriptions the controlling interest in the road "for the sake of private aggrandizement or fraudulent profit," and that such apprehension retarded those who, but for such apprehension, would subscribe; that *Blossom* and *Sweet*, but particularly *Sweet*, repudiated any such apprehension, and denied any such intention on his part.; that on account of such denial of intention on the part of *Blossom*

and *Sweet*, some of the complainants were induced to make subscriptions, and the bill states the amount subscribed by the several persons who are complainants, upon that hypothesis, and that they paid one dollar on each share so subscribed; that amongst the subscribers, to make up the subscriptions to the amount of one thousand shares, were the defendants *Sweet*, *Clark* and *Webb ;* that much anxiety was entertained that the subscriptions should be made to the amount of one thousand shares, so that the company should be organized ; that it was frequently stated at the public meetings, held on the subject of the road, to the knowledge of a part of the defendants in the bill, that when one thousand shares of the stock were subscribed for, the books of subscription should be closed by the commissioners, and an election of directors had.

That the commissioners, on the 14th day of December, 1848, passed a resolution, that as soon as the amount of one thousand shares should be subscribed, and the sum of one dollar on a share paid, the books of subscription should be closed and the company organized ; and that the money paid on such subscription should be deposited with Alexander Mitchell, secretary of the Wisconsin Marine and Fire Insurance Company, subject to the drafts of the president and directors of the company ; that the books were closed ; that at the time of closing them, *Williams*, one of the defendants and a commissioner, produced another book of subscription kept by him, which contained subscriptions made by the defendant *Sweet* for two thousand shares, of the said *Webb* for two hundred and fifty shares, of the defendant *Davis* for two hundred and fifty shares, of the defendant *Clark* for two hundred and fifty shares; which, from information and belief, the complainants charge, was kept secret from the residue of the commissioners at the time of the passage of the resolution to close the books of subscription, and also from most of the other subscribers. The bill charges that if the complainants had known of these latter subscriptions, they would not have made their former subscrip-

tions to the stock; charges, upon information and belief, that the defendants *Sweet, Webb, Davis* and *Clark*, did not at the time of making their said subscriptions, or at any time since, pay one dollar on each share thereof *to the said Mitchell*, and that no part of such subscriptions have come to the hands of the commissioners; that the persons last mentioned, to wit: *Sweet, Webb, Davis* and *Clark*, or some of them, pretended to deposit the money on such subscriptions with *Williams*, one of the commissioners, but who was acting therein, in collusion with *Sweet* and others aforesaid, in regard thereto; and who returned the money so received by him to the said last mentioned subscribers. The bill charges, from information and belief, that such alleged pretended subscriptions and payments were fictitious and fraudulent as against the complainants, and in fraudulent confederacy with the defendants, *Blossom* and *Williams*, two of the commissioners; that upon information and belief, such subscriptions aforesaid were secretly made, and in confederacy as aforesaid, and to deceive the complainants; that at a meeting of the commissioners, held December 22, 1848, they resolved to open the books for further subscription, and that immediately upon the passage of the resolution, the defendant *Blossom* entered in the subscripton books a subscription in his own name, for five thousand shares of the said stock, but, upon the information and belief of the complainants, did not then, or at any time, pay to the commissioners or to Mitchell, the sum of one dollar on a share for such stock so subscribed for by him; that such subscription was made in confederacy with *Sweet, Davis, Webb, Clark* and *Williams;* that upon information and belief, the said *Blossom*, at the time of making such subscription was directed by the commissioners to pay one dollar on a share, subscribed by him to Alexander Mitchell, which he refused to do; and upon such refusal the commissioners passed a resolution authorizing Timothy Jackman, one of the commissioners, to receive the money, but that *Blossom*

refused, alleging that he had paid the money to *Williams*, one of the commissioners; but *Williams* refused to pay the same to the other commissioners, or deposit the same with Mitchell; that, thereupon, the majority of the commissioners passed a resolution refusing to receive the subscription of *Blossom*; alleges a confederacy by *Blossom*, *Williams* and others to make a pretended payment, but claims it to have been fictitious and unreal, and that the money did not belong to *Blossom*, and that his subscription was not made *bona fide;* that after the passage of the resolution to reject the subscription of *Blossom*, A. Hyatt Smith, one of the commissioners, as the attorney of the defendants *Wells*, *Kneeland*, *Ludington* and *Weeks*, made subscription for them of seven thousand five hundred shares of the stock, one-fourth part for each of said defendants, which subscription is alleged to have been made to acquire the control of the company; that no actual payment was made on such subscription, so made by Smith; that the commissioners gave notice of an election of directors for the fifth day of February, 1849, and directed certificates of the stock subscribed for, to be made and delivered to the subscribers who had paid one dollar on a share; that the duty of filling up the certificates devolved principally upon *Blossom*, as secretary of the board; that on the day appointed for the election of directors, Thayer, the president of the commissioners, signed the certificates made out for him, without any particular examination of them, and *Blossom* signed them as secretary; that it was not intended, as the bill alleges, to issue certificates to the defendants *Sweet*, *Webb*, *Davis* or *Clark*; but that *Blossom*, acting in confederacy with them, made out and signed certificates for them which were also signed by Thayer, as president; that these certificates, after having been made and signed as aforesaid, were fraudulently abstracted by some one of the parties in whose name they were issued. Charges, upon belief, that *Blossom* was aiding in such abstraction, and that there was a concerted plan to obtain them fraud-

ulently, and by that means to obtain the control of the company. That on the fifth day of February, 1849, *Blossom* fraudulently filed a bill of complaint, acting therein, as is alleged in the bill in this cause, in concert with several of the defendants, and to prevent an organization of the company, and to obtain the control thereof; which bill was filed against the commissioners, as defendants, seeking to have them restrained from issuing certificates of stock subscribed for, in prejudice of the subscription made by himself, and to restrain them from further action in the way of the distribution of the stock to the prejudice of his subscription, claiming therein that he had made his subscription in good faith, and had paid in one dollar on each share subscribed for by him, to one of the commissioners, at a meeting held by them for receiving subscriptions, and that the commissioners had attempted, by resolution, to vacate his said subscription and deprive him of his stock, and refused to assign the same to him, and asking therein that the said commissioners might be restrained from presiding at any meeting for the choice of directors, or from any other official act until the order of the court in the premises, unless they should first grant to him the assignment of the stock subscribed for by him, in the order in which subscriptions for said stock were made by him and others who had subscribed therefor; and charging in the bill that the act of the commissioners, in withholding his stock from him, was fraudulent and unjust. The bill in this cause further alleges, that on the fifth day of February, 1849, when the commissioners were met together to distribute and assign the stock amongst the subscribers, *Blossom* caused an injunction to be served upon all the commissioners except himself, restraining them as aforesaid, and also a subpœna to answer the matters of his bill. The bill alleges this act of *Blossom* as fraudulent, and that he fraudulently delayed the service of the process until the time of the meeting as aforesaid, to obtain some advantage, or to prevent an organization of the company, and to obtain the control of the

company; that on the twenty-second day of February, *Blossom* discontinued his said suit, by causing a discontinuance thereof to be entered with the clerk; that the commissioners, from and after the service upon them of the injunction, took no further action touching the distribution of the stock or the organization of the company.

That the defendants *Sweet, Webb, Hibbard, Davis, Greves* and *Taylor* assumed to be directors of the company, and to exercise the functions of such office, and claim that the said company is organized in accordance with the act creating it, and have made contracts for the construction of the road, etc., and are performing all the functions of directors, as if they were such in fact, and claim to have been elected by the stockholders in accordance with the said act. The bill also charges that the acts of the persons aforesaid are fraudulent as against the rights of the complainants and others, subscribers to the stock; that *Blossom*, as secretary of the commissioners, has possessed himself of all the papers, subscription books and records, and has delivered them to the defendants, who assume to have been elected directors.

The bill called for answers to the several matters alleged and charged therein, and prayed that all the proceedings taken by defendants to organize the company after the time of the service of the injunction in the suit commenced by *Blossom*, might be declared void, and that the defendants be decreed to deliver to the board of commissioners all the books, records and proceedings of the commissioners which have come to the defendants' hands, and that the subscriptions to said stock of five thousand shares made by the defendant *Blossom*, of two thousand shares made by *Sweet*, of two thousand shares made by *Webb*, of two hundred and fifty shares made by *Davis*, of two hundred and fifty shares made by *Clark*, and of seven thousand five hundred by *Weeks, Wells, Kneeland* and *Ludington*, may severally be declared void; and that the certificates of stock signed by Thayer, as president of the commis-

sioners, and by *Blossom*, as secretary, for such subscriptions aforesaid, may be decreed to be null and void, and delivered up to be canceled; and that all proceedings had in the organization and affairs of the company by any persons other than the commissioners be decreed null and void, and that the defendants acting as directors, and their secretary, may be decreed to deliver up the books, papers, etc., of which they are possessed, etc.; and that the complainants and their associates may be decreed to be the only stockholders of the company; and that it be decreed that it is the duty of the commissioners to cause an election of directors to be held by the stockholders in pursuance of the act of incorporation, and to preside at and superintend such election, etc., and for any contingent relief that may be required. The bill also prayed for an injunction against the persons claiming to be and acting as directors.

To this bill the defendants interposed a general demurrer, and assigned as causes: 1. That the bill was multifarious. 2. A want of jurisdiction in the circuit court. 3. That the corporation should have been made a party. 4. That the complainants had not a right to file their bill in behalf of themselves and others who do not join with them as parties. The court sustained the demurrer, and complainants appealed.

*E. G. Ryan*, for appellants:

The bill recites (in part) the charter of the company (Territorial Session Laws, 1848, p. 88), and states a *bona fide* subscription of one thousand shares of the capital stock and the payment of one dollar on each share, pursuant to the provisions of the charter, by the complainants and their fellows; a secret fraudulent subscription, to one commissioner only— *Williams*—by *Sweet*, *Davis*, *Webb* and *Clark*, of two thousand seven hundred and fifty shares of stock, without any payment as required by the charter; a fraudulent subscription of five thousand shares by *Levi Blossom*, without payment; a fraudulent subscription of seven thousand five hundred shares by *Wells*, *Weeks*, *Kneeland* and *Ludington*, without payment;

a fraudulent suing out and abuse of the process of injunction of the court in which this bill was filed by *Blossom*, enjoining the commissioners from organizing the company by an election pursuant to the charter, in order to defeat, and which did defeat, an organization of the company under the charter ; a fraudulent confederacy in all these and minor acts by *Sweet, Davis, Hibbard*, the agent of *Clark, Webb, Blossom* and *Williams*, who was another of the commissioners, for the purpose of obtaining a fraudulent control of the stock and organization of the company, and of thereby defrauding the complainants and their fellows ; that upon the service of *Blossom's* injunction, the commissioners, in obedience to it, abandoned the further prosecution of their duties under the charter ; that in pursuance and in accomplishment of the whole confederacy, and by means of such abandonment by the commissioners, in obedience to the injunction, *Sweet, Webb, Davis, Hibbard, Greves* and *Taylor*, under some fraudulent, fictitious and unfounded pretense, assume to be directors of the company, have obtained from *Blossom* the books, papers, etc., of the commissioners, and have assumed to bring suits and collect moneys, etc., in the name of the corporation ; and that Chandler, under them, assumes to be secretary of the company.

The bill charges that the corporation is not organized under the charter ; but, if the court, upon the construction of the charter, should be of opinion that it is, then that the commissioners are the officers of it ; and charges, that the commissioners are bound to prosecute their duties under the charter, and that a majority of them would do so, if so advised by the court ; the bill prays, that the said several fraudulent subscriptions be set aside and declared void ; that all pretended proceedings in the organization of the company, subsequent to the service of *Blossom's* injunction and the consequent abandonment of their duties by the commissioners, be declared void ; that the books, papers, etc., of the company be delivered up to the commissioners ; that the com-

plainants and their fellows be declared the only stockholders of the company; that it be declared the duty of the commissioners to hold an election under the charter; and for general relief.

We apprehend, that if there is no equity in this bill, it is because equity has ceased to be administered. But before considering that, it is deemed the most proper to dispose of the technical objections; and these will be considered in the order assigned to them.

*First.*—Multifariousness.

A bill is not to be treated as multifarious, because it joins several good causes of complaint, *growing out of the same transaction*, where all the defendants are interested in the same claim of right, and where the relief asked for is of the same general character (Story's Eq. Pl. 233, § 284); even where they claim under distinct titles and have independent interests. Id., §§ 285, 286 and 287.

So a bill is not to be held multifarious, if the complainants assert a general right against the defendants, although there be no privity between the defendants. *Mayor of York v. Pilkington*, 1 Atk. 284; Mitford's Eq. Pl. 182; *Varick v. Smith*, 5 Paige, 137, 160; *Fellows v. Fellows*, 4 Cow. 682; *Brinkerhoff v. Brown*, 4 Johns. Ch. 139, 152.

Here the complainants set up one general right, that they and their fellows are the only stockholders, against all of the defendants, and therefore the bill is not multifarious. And all of the defendants, except the commissioners, claim on fraudulent subscriptions against the common right of the complainants, and the commissioners abandon their duties to the complainants in consequence of the same, and therefore the bill is not multifarious.

The whole is charged as one concerted confederacy, except the subscription of *Wells, Weeks, Ludington* and *Kneeland;* and as against the complainants, there is privity between them and the other fraudulent subscribers, because it was an an-

tagonistic struggle between them, in fraud of the complainants on the part of both.

If two commit a felony or a trespass against a third, although the two do the act in hostility to each other, each seeking to defeat the other and to obtain for himself the whole advantage, they are privies as to him against whom the felony or trespass is committed.

Here there could be no adequate relief in several bills. The complainants could not have their right, as the only stockholders, settled, unless all claiming against that right were in court. The proper decree directing the commissioners in their duties could not be made, unless all these parties were in court. The parties could not be reinstated *in statu quo ante Blossom's* fraudulent injunction, unless they were all in court.

The whole subject is *one*, and not susceptible of convenient division; and separate bills for each right and each wrong would be open to the opposite objection to multifariousness, undue divisiblity, promoting unreasonable litigation. Story's Eq. Pl., § 287.

But the demurrer is not well taken in practice. The bill charges several of the demurring defendants with special combination, and the rule is, that in such case the defendants demurring for multifariousness must accompany their demurrer by an answer denying the combination charged. Mitford's Eq. Pl. 181; *Powell v. Arderne,* 1 Vern. 416.

On this point the court below fully sustained these positions, and we think there is little difficulty in concluding the bill free from this objection, a mere objection of convenience, here urged for inconvenience.

*Second.*—Want of jurisdiction.

So far as we comprehended the force of the argument of the defendants and the opinion of the court in sustaining this ground, it signified that that part of our case which sought a declaration of the court, that all proceedings subsequent to the

service of *Blossom's* injunction were void, is the subject of information by the attorney-general, and that the relief cannot be had on a bill filed by private individuals.

In the first place we say to this, that if the position were true, it goes only to a part of the bill, whereas the demurrer goes to the whole bill, and therefore, if true, could not sustain the demurrer.   Story's Eq. Pl. 349, § 443.

As to the conflicting rights between the complainants and the fraudulent subscribers, and the duties of the commissioners to the complainants, and all the relative rights between individuals, the court will always and of common practice interfere to grant equitable relief, on the application of the persons aggrieved.   *Gray v. Chaplin*, 2 Sim. & Stuart, 267 ; *Hitchens v. Congreve*, 4 Russ. 562 ; *Adley v. Whitstable Co.*, 17 Ves. 315 ; *Walker v. Devereaux*, 4 Paige, 229 ; *Meads v. Walker*, Hopkins, 590 ; *Haight v. Day*, 1 Johns. Ch. 48 ; *Robinson v. Smith*, 3 Paige, 322.

So far then as setting aside the frauds of the defendants, and restoring their rights to the complainants is concerned, clearly the bill by private persons is good, and admitting the whole argument of the defendants, the bill and the relief it seeks are good in part, and the demurrer being to the whole bill cannot be sustained.   But we deny that there is any relief sought by this bill, which can only be had by information by the attorney-general.   The bill asks for no judgment of ouster, involves no public right.

This is not a proceeding to measure the extent or ascertain the forfeiture of a corporate franchise.   These would be questions of *public* right within the duty of the *public* legal officer, the attorney-general.   Here the franchise is admitted ; all parties claim under and assert it.   There is no question of its extent or of its forfeiture, but the only questions are of the relative *private* rights of *private* persons, under the act conferring the franchise.   The bill is by *private* persons to enforce *private* rights, and for relief against *private* wrongs.

Again, the mere assumption to be directors by private persons is no *public* wrong. It is a private wrong on the stockholders, with which the state has nothing to do. The bill shows that they are not and cannot be directors *colore officii.*

By the third section of the charter, the commissioners are invested with the same powers and duties as directors ; by the fifth section they are to *superintend* and direct all the proceedings of the company ; by the third section they are to give notice of holding an election. Who is to *superintend* or preside over the elections ? Clearly the commissioners. The injunction, therefore, to them, *not* to superintend the election, was an injunction against an election. No one else could hold it ; and in law, as the bill charges in fact, no election was or could be held.

The mere assumption of persons to be directors, without any right, confers no color of office. But this bill does not even ask them to be excluded. It only asks that they may deliver papers, of which they have obtained a fraudulent possession, to the commissioners, to whom they belong, and prays a declaration that all the consequences of a fraudulent abuse of the process of the court shall be declared void.

The injunction was a part of the confederacy to defraud the complainants ; and inasmuch as it prevented an election, it enabled these persons to set up their fictitious claims to be directors. And as this was done *pendente lite,* even if no injunction had been abused as here alleged, it would have been such a fraud upon the court as would be summarily relieved against. *Attorney-General v. Dixie,* 13 Ves. 519, explained in *Attorney-General v. Clarendon,* 17 id. 491.

The whole of this argument is greatly strengthened if, as we shall hereafter contend, the corporation is not *in esse ;* if there is no corporation, there are of necessity no directors.

The attorney-general is the law officer of the state ; he asserts and represents the rights of the sovereignty ; where they are asserted, he must assert them ; where they are in

question, he must be a party. But it does not need his sanction to assert a private right or remedy a private wrong. The doctrine that the attorney-general only can proceed in a case of private wrong and private right; that a private person cannot assert a private right against a private wrong in a matter of private interest, without calling in the aid of the attorney-general, simply because the case arises from corporate relations, is a new, monstrous, oppressive and iniquitous doctrine. Mitf. Eq. Pl. 147, marg. p.; Story's Eq. Pl. 52, 53, §§ 49, 50; *Attorney-General v. Moses*, 2 Mad. 500; *Bromley v. Smith*, 1 Sim. 8. Here the bill does not show a case of the public nature of the right, nor where all persons interested are parties to the abuse. But it seeks, on behalf of private persons, to rescue their private property from private fraud.

Courts of equity have long felt the use of full power over these questions; our legislature has given them concurrent jurisdiction with courts of law. Session Laws, 1841, p. 36. The jurisdiction conferred by this act is to be exercised according to the practice of courts of equity, not of courts of law.

The act of 1846 (page 85) refers only to cases of ouster or restraint from undue use or extension of corporate franchises, and does not limit the second clause of the act of 1841. But even without such an act, a court of equity would remove officers of a corporation, even when holding colorably. *Ogden v. Kip*, 6 Johns. Ch. 160; *Gable v. Miller*, 10 Paige, 627.

Again: an information, in the nature of a mandamus, would afford no sufficient relief. And equity will not drive a party to such a remedy, inefficient in its nature, merely because it is the case of a corporation. *Adley v. Whitstable Co.*, 19 Ves. 305.

Had we sought by this bill to oust the corporation, or to restrain the franchise, or raised any other question *publici juris*, we could understand the argument. But here is this case. The stock is a trust fund; the complainants are the *cestui que trusts*, with an exclusive right to elect directors, as

trustees of the fund; they have been prevented from doing so by a fraud committed on their rights of property; and certain persons, in collusion with those who committed the fraud, assume to act as trustees of the complainants, as directors of the company, and have taken a part, and seek to take all of the trust property; we ask the court to restrain them. Such is the whole case, and such is the common practice of courts of equity. We will hereafter examine further the general jurisdiction of the court under this bill; we have so far confined the argument to the objection urged.

*Third.*—For want of a proper party, the corporation, "The Milwaukee and Janesville Plank Road Company."

To this objection we give three answers:

1. The corporation is not yet *in esse.* 2. If *in esse*, it is not a necessary party. 3. If *in esse* and a necessary party, it is sufficiently before the court.

But, before passing to these points, we desire to consider another:

Want of necessary parties is good ground of demurrer; but on such a demurrer being sustained, the court will always grant leave to amend, and not dismiss the bill; and even if dismissed because the necessary party cannot be made, it is without prejudice. Story's Eq. Pl. 415, § 541; *Jones v. Jones*, 3 Atk. 110. Therefore, this ground of demurrer, if well taken, cannot sustain the decree dismissing the bill, nor will this court regard it with favor. *Wormly v. Wormly*, 5 Cond. 486.

1. The corporation is not yet *in esse.*

This depends on the construction of the charter, which is to be given according to sound and convenient rules of interpretation, and not by mere verbal or puerile criticism. This is not the case of a corporation created by the charter, *eo instanti;* but of a corporation to take effect on compliance with certain pre-requisites. The charter vests no rights. Rights under it are to be acquired only by subscription.

The first section speaks of the company "hereby incorporated;" whereas, no corporation might ever exist under the act, by a failure of subscription; it would be very puerile to urge that the corporation existed *eo instanti*, yet such is the strict verbal construction.

The second section provides, that when one thousand shares are subscribed for, and one dollar a share paid in, the subscribers, with such other persons as shall associate with them for that purpose, are created a corporation. We do not think that a sound construction of this last provision will warrant the conclusion, that the moment the last share is so subscribed for, and no second of time sooner or later, the corporation is *in esse*. We should then have to determine whether the last stroke of the pen in the name of the subscriber of the thousandth share, or the passing of the dollar from his hand to the commissioners, or what stage of that momentous passage of a dollar, was the solemn act of the imposing solemnity which called the corporation into being. Suppose nine hundred and ninety-nine shares subscribed; suppose another subscriber adds ten; would the corporation be *in esse* on the payment of the first dollar; or wait in abeyance, until the subscriber fulfilled his contract by the payment of the other nine? Or, if he paid first and subscribed after, would the corporation be *in esse* when he wrote the figure 1, or await the existence of the momentous cypher? This is very puerile and absurd; yet these are considerations which courts might be called upon to determine, by a literal construction of the provision.

Again: not only the subscribers of the one thousand shares are thus incorporated, but such other persons as shall afterwards become associated with them. Does the corporate character of these other persons antedate to the time of the subscription of the last of the one thousand shares? Yet such is the literal construction contended for. The creation of a corporation is an act of more moment, attended with more certainty and solemnity than this. We must look to

other provisions of the act, for a more rational construction of this.

Now, the third section provides, that as soon as one thousand shares are thus subscribed, the commissioners shall call an election. Why *then*, and not await further subscriptions? Because there then vests a right to organize the corporation, to be composed of those subscribers and such as shall afterwards subscribe. The election of directors is the organization of the corporation. This is the solemnity, plain, certain and defined in its nature, which is to call the corporation into being. The provision, fairly and rationally construed, has this meaning : the subscribers, *before* one thousand shares are subscribed, have a contingent right of forming a corporation ; *after* one thousand shares are subscribed that right becomes vested. The subscribers have the right, in virtue of the subscription of the one thousand shares, to form a corporation, together with such other persons as shall become associated with them, by an organization by means of an election of officers. Before the election, there are no officers of the company. The commissioners have, as far as applicable, the powers of directors, but not the office ; the commissioners are the officers of the state, the directors the officers of the company. The commissioners remain commissioners to the end.

It was contended below, that as soon as the one thousand shares were subscribed, the commissioners became directors, and were required to elect a president and secretary. Neither of the propositions is correct. The act confers the powers of directors on the commissioners, as well before as after the subscription, but not the office of directors ; and as the commissioners are required (sec. 5.) to give certificates of subscriptions, signed by their president and secretary, it seems very plain, that they are required to choose a president and secretary *before* receiving any subscriptions whatever, each subscriber being entitled to such certificate, when he subscribes.

The whole argument gains great force from the fact that the commissioners, being prevented from organizing the corporation by an election, abandoned wholly all concern with the company.    The complainants and their fellows are the only persons entitled to become corporators, and to organize the corporation ; they have not done so.    They have an interrupted but subsisting right to organize a corporation ; but they have no officers, no corporate organization, no corporate union, no corporate power of action.   In *Meads v. Walker*, Hop. 587, the charter is quoted and seems very similar to this; there the chancellor either considered the corporation not *in esse*, or not a necessary party.    We think he did not consider it *in esse*.

Upon the whole, it seems to us obvious, that a rational and the most rational construction of the provision of the charter is, that the subscription of one thousand shares vests in the subscribers an absolute right, contingent before, to organize themselves as a corporation by an election of officers, and that the election vests the franchises.

2.  The corporation, if *in esse*, is not a necessary party. ·

The corporation, as such, has no interest to be affected by this bill.

As will be seen hereafter, the fraudulent subscriptions, sought to be set aside, confer no right on the corporation ; they are absolutely void ; they cannot be enforced by the corporation. And even if this were otherwise, the corporation could not elect to enforce them as against the rights of the complainants. *Bromley v. Smith*, 1 Sim. 8.

In the cases relied on by the defendants below, the question was of the application or misapplication of the corporate funds ; and in such cases, the corporation was held to be a necessary party interested in the question.    It is also noticeable that they are all cases of established and organized corporations.    Here is the case, admitting the corporation to be *in esse*, of an inchoate corporation not yet organized.    And it is a case

where the presence of the corporation seems wholly unnecessary. The objection seems wholly and purely technical and not entitled to much weight. *Gray v. Chaplain*, 2 Sim. & Steu. 267; *Hitchens v. Congreve*, 4 Russell, 562; *Gable v. Miller*, 10 Paige, 627; *Haight v. Day*, 1 Johns. Ch. 18; *Meads v. Walker*, Hopkins, 587; *Walker v. Devereaux*, 4 Paige, 229; *Philips v. Wickham*, 1 Paige, 590. The foregoing are all cases of corporations, having more or less similarity to this case, in none of which was the corporation a party.

3. If *in esse* and a necessary party, the corporation is sufficiently before the court.

As has been already shown, the corporation is a mere *formal* party. It is merely writing the formal name in the bill. It is not substantially bringing any new party into court. The corporators, the complainants, are in court: the claimants to be corporators by the subscriptions we seek to impeach, are in court: the commissioners, whom we claim to be the officers, if the corporation is *in esse*, are in court: the assumed directors are in court; what else is there to bring into court? Nothing but a name. What is gained by bringing this name into court? The defendants' counsel below answered this question well, by a ludicrous description of the rival answers and defenses of the commissioners and the assumed directors, both claiming to be the officers. Because, if the corporation is *in esse*, the commissioners should act as the directors. How much weight should be attached to such an objection may be seen in the opinion of that master of equity, the late Judge Story, in *Wormly v. Wormly*, already quoted.

On the whole, we do not think the objection well taken; but, if well taken, it cannot sustain the decree dismissing the bill.

*Fourth.*—That the complainants have no right to prosecute this bill.

This point involves the question of the right of the complainants to exhibit the bill on behalf of themselves and all others *bona fide* subscribers to the capital stock.

Putnam et al. vs. Sweet et al.

The bill alleges the stockholders to be very numerous and unknown to the complainants, and shows a case of common right in the complainants and all others whom they claim to represent. It is unnecessary that all of the stockholders should be parties. In equity a few of a large number, having a common right, may maintain a bill in aid of the common interest, on behalf of themselves and their fellows. Story's Eq. Pl. 112 to 129, § 107 to 126; Fonblanque, 297, marg. p.; Mitford's Eq. Pl. 168, 169, marg. p.; *Gray v. Chaplin*, 2 Sim. & Stuart, 267; *Hitchins v. Congreve*, 4 Russ. 562; *West v. Randall*, per STORY, J., 2 Mason, 193; *Wood v. Dummer*, 3 id. 508. Even when a majority of those interested are opposed to the suit. *Bromley v. Smith*, 1 Sim. 8.

The argument in the court below on this point we understand to be this: That there was a right of election on the part of the corporation to reject or to enforce the fraudulent subscriptions, and that therefore there was no common right in the stockholders. To this we give two answers:

1. There can be no right of election in fraud. Any one of a number affected by a fraud has a right to resist it; and no number of others, equally affected by it, can elect to sustain it and make a profit of it. These subscriptions are a fraud on the complainants, and even if every other stockholder, or the corporation sought to enforce them, the complainants have the right to impeach them. *Bromley v. Smith*, 1 Sim. 8.

2. The subscriptions are absolutely void and cannot be enforced. The charter requires the payment of one dollar per share on subscription. The bill charges all of these impeached subscriptions to have been made without such payment. And they are therefore wholly fraudulent and void. *Jenkins v. Turnpike Co.*, 1 Caines Cases, 86; *Turnpike Co. v. Henderson*, 8 Serg. & R. 219; *Leighty v. Turnpike Co.*, 14 id. 434; 434; *Crocker v. Crane*, 21 Wend. 211.

If these subscriptions cannot be enforced against those making them, *a fortiori* they cannot be enforced by any right

of election against the complainants whose rights they are in fraud of. In any view, these complainants have a right to maintain this bill. For many reasons already urged, the corporation—even if *in esse*—could not be complainant to enforce the rights of these complainants.

The bill shows that the commissioners have wholly refused further interference, unless directed by the court; and as to the assumed directors, they are mere intruders without color of right, and are part of the machinery of the confederacy against the rights of the complainants.

If there be a corporation the bill discloses enough to show that one complainant could not use its name as complainant.

But this bill is framed in this respect precisely like the bills in many similar cases already cited.

Having thus disposed of the special grounds of demurrer assigned, we shall next proceed to consider the equity of the bill.

To sustain the general scope of this bill, we rely on three great grounds of equitable jurisdiction :

1. Partnership.  2. Trust.  3. Fraud.

1. On the ground of partnership, equity assumes a jurisdiction in all matters involving the partnership relations, which is practically exclusive.  1 Story's Eq. 612, 631.

The relations of corporators in an actual corporation, established for private profit, are very much the same as the relations of partners in an unincorporated company, and this has been stated on very high authority.  Per SEWALL, J., 3 Mass. 377 ; SEDGWICK, J., id. 382 ; PARKER, C. J., id. 264 ; WALWORTH C., 3 Paige, 232.

But this bill does not present the case of an organized corporation ; it presents the relations of the subscribers to the stock before the organization of the company.  And before that organization, they stand in the same mutual relations as stockolders in a joint stock company.  A joint stock company is organized on the same general plan as a corporation, and

they differ only in this, that the former exists only by mutual agreement. A corporation is a joint stock company by charter of law. A joint stock company is a corporation without charter. Here is no organized corporation till election, and all the jurisdiction of the court in relation to joint stock companies applies to them.

Now, as it has been seen that corporations are considered *quasi* partnerships, so joint stock companies are dealt with as mere partnerships. Story on Part. 254.

Here is a case of contributors to a common fund, for equal profit and at equal risk; so far they stand as partners in a joint stock company. Neither are they corporators, for there is no organized corporation. The corporation may never be organized, and for all purposes of equitable jurisdiction, they stand together in the relation of a partnership. But the cases make the analogy stronger than this. In England these joint stock companies, without being strictly incorporated, are licensed, and their powers and duties defined by act of parliament, as *quasi* corporations. And the courts of equity there deal with them as partnerships and sustain such bills as this. *Gray v. Chaplin,* 2 Sim. & Stuart, 267; *Hitchens v. Congreve,* 4 Russ. 562. And even in the case of a regular corporation. *Adley v. Whitstable Co.,* 17 Ves. 315.

We see no sound distinction between these cases and the case before the court. They are equally cases of subscribers to the stock of companies organized under act of the legislature, and the only difference is in this, that here there is a capacity to become a corporation, which capacity, however, has never been and may never be exercised. We think, therefore, that if there were no other ground of jurisdiction in this court over this case, it would take it on the general ground of jurisdiction to regulate and control partnership relations.

2. Equity takes exclusive jurisdiction of the administration of trusts, express or implied; this is one of the most comprehensive grounds of equitable jurisdiction; whenever one

intrusted with the administration of the property of another has abused or is about to abuse such trust, equity will grant relief to the *cestui que trust*. 2 Story's Eq. 228–230.

We assume that the funds subscribed to the stock of this company are a trust fund, of which the complainants and their fellows are *cestui que trusts*, and the commissioners, in the first instance, the trustees. The funds were the complainants' funds, when paid; remained beneficially theirs, after paid, although they became vested in the commissioners, and the commissioners held them for the use of the complainants. The commissioners had the legal title, the complainants the equitable and beneficial ownership. This is the exact definition of a trust. 2 Story's Eq. 230. Nor is it any new doctrine that corporate funds are a trust in equity, which the court will control and preserve. 2 Story's Eq. 498, 499; *Attorney-General v. Utica Insurance Co.*, 2 Johns. Ch. 386–389; *Wood v. Dummer*, 3 Mason, 311; *Robinson v. Smith*, 3 Paige, 222; *Mumma v. Potomac Co.*, 8 Pet. per STORY, J., 286; *Charitable Corporation v. Sutton*, 2 Atk. 400–406.

In *Attorney-General v. The Utica Insurance Co.*, Chancellor KENT doubted if that court possessed the extensive jurisdiction over corporations which the English court exercised; but he strongly affirms the jurisdiction on the ground of trust.

Thus we think it established, by the force of reason and authority, that these funds are a trust fund, the due administration of which this court will protect. And the whole argument is greatly strengthened by the fact, that the corporation is not organized.

Now, here is a charge that men, having no title to the character of trustees, have fraudulently ousted the trustees, the commissioners, and are about to obtain unlawful possession of the trust fund, of which the complainants and their fellows are the *cestui que trusts*. And no court of equity ever refused to interpose its authority in such case, except on some scruple about jurisdiction, of which there can be no doubt here.

3. Fraud is the great ground of equity jurisdiction, and courts of equity may be said to possess a general, and perhaps a concurrent jurisdiction with courts of law in cases of fraud cognizable in the latter, and exclusive jurisdiction of fraud beyond the reach of courts of law. 1 Story's Eq. 194, 195. Definition of equitable fraud. id. 196–199.

Even judicial proceedings are not in equity exempt from impeachment for fraud. 1 Story's Eq. 256 ; *Kennedy v. Daily,* Sch. & Leaf. 355 ; *Borden v. Fitch,* 15 Johns. 121.

It would seem from a mere reading of this bill unnecessary to argue this question of fraud, for the acts of fraud are many, actual, palpable and gross.

The several acts of fraud charged, and for' relief against which this bill is filed, are all palpably fraudulent in themselves. They are attended by so many circumstances indicating the fraudulent intent, that it would be idle to attempt a demonstration of their character. But it is proposed to show that they have been adjudicated to be so. We charge the defeat of the organization of the corporation to distinct frauds on the part of the defendant *Sweet* and his confederates. And here the court will bear in mind that these confederates are not merely charged with formal combination in the charging part of the bill, but with actual fraudulent combination and concert in the stating part.

The main frauds charged are : 1. *Sweet & Co.'s* subscription of two thousand seven hundred and fifty shares coupled with the fraudulent abstraction of the certificates. 2. *Blossom's* subscription of five thousand shares. 3. *Blossom's* injunction. 4. *Wells & Co.'s* subscription of seven thousand five hundred shares.

These subscriptions are all fraudulent, for the non-payment of one dollar on each share, as has been already seen. The first of them (*Sweet & Co.'s*), we also contend, is fraudulent, because made in *secret* with a fraudulent intent ; and also because made to one commissioner only—the charter requir-

ing it to be made to a majority of them. In the *Blossom* subscription, the collusion between *Williams and Blossom*, will not aid it. 1. The bill charges, that no payment was *bona fide* made to the commissioners, or even to *Williams*. 2. If made to *Williams*, and by him not made to the board of commissioners, *Blossom* would be holden by his default, they acting in collusion. 3. If paid to *Williams* at all, it was so paid not only before the subscription was made, but before the books were re-opened, and was, therefore, paid to him as agent of *Blossom*, not as commissioner; for as commissioner he had no authority to receive it, until the books were open and the subscriptions made. If so paid, it was in *Williams'* hands before the subscription as *Blossom's* agent, and so remained after the subscription, for no man can pay money to himself. *U. S. v. Boyd*, 5 How. 49. And this applies with great force, where there was a plain juggle between the two to retain the money from the control of the commissioners.

Another objection, which applies to all, is this, that the commissioners had no power to receive subscriptions after the twenty thousand dollars were subscribed. There can be no doubt that all those subscriptions were a gross fraud upon the charter and upon the complainants.

*Blossom's* injunction was a fraud. Judicial proceedings may be impeached for fraud. 1. Story's Eq. 256; 1 Maddock's, Ch. Pr. 300. Positive fraudulent intention is averred in this bill, in the suing out of this injunction. There is no foundation in the stating part of *Blossom's* bill for the injunction to restrain the commissioners from holding the election, nor is that part of the injunction in aid of any relief prayed by his bill. It is apparent that it was sought and used in fraud. The granting of it was an act of arbitrary and fraudulent power, without a color or palliation by the law or practice of courts of equity. All of these acts are fraudulent in fact and in law, and they are just such frauds as courts of equity delight to grant relief against, as may be seen in the

Putnam et al. vs. Sweet et al.

cases quoted and numerous others which might here be multiplied if deemed necessary.

This bill is a solemn appeal to the equities of the court, and it is to be determined whether the technicalities which every ingenious lawyer can invoke to the aid of bold, successful and shameless fraud, shall triumph over justice, truth and right, or whether this court, sitting as a court of equity, will break through such specious obstructions, and render justice according to the very right of the case.

Corporations, such as this was designed by the legislature to be, are a part of the modern machinery of public improvement by means of private capital. If such frauds as these can be practiced with impunity, and the sufferers are referred to impracticable remedies, capital will fly from such enterprises, and charters for public improvement will be left without other capital than that contributed by these defendants to the enterprise—fraud, falsehood and chicane.

*Chandler & Holliday*, for appellees:

This court has no original or concurrent jurisdiction with courts of law in the case made by this bill.

This court cannot exercise jurisdiction over corporations when formed and *in esse*, except in cases where the corporation abuses the trust, or perverts its powers, or misapplies its funds and resources, in derogation of the rights of the corporators, and applies the funds to objects hostile to the common interests. In such cases this court has jurisdiction, without being indebted to legislative provision, and may exercise it ; but in those cases even the corporation must be made a party, and the existence of the corporation must be alleged in the bill. 2 Paige, 438 ; 1 Marsh. 594 ; 2 Johns. Ch. 245 ; 5 id. 381.

It is claimed here, however, that the statute laws of this state authorize this court to take jurisdiction in all cases where a court of common law could exercise it over corporations. This is denied.

The statutes of 1841, page 36, provide that this court "shall have power to declare the charter of any corporation to be forfeited for any just cause," and possess the same powers upon the subject of *corporations* that is possessed by common-law jurisdictions.

The whole effect of this statute is to invest this court with the like powers which were possessed by courts of common law before its passage touching *corporations;* but it in no sense extends those powers. It is a mere enjoyment, in common with courts of law which had previously possessed *that* jurisdiction in exclusion of this court, but does not exclude the functions of courts of law.

But how is this jurisdiction to be exercised? Of course, through the medium of the same parties, and by a like proceeding which existed and still exists in the courts of law, adopting in this court a bill in the nature of an information instead of the *mandamus* in the court of law.

A change or extension of jurisdiction did not change either the parties or the order of procedure, as it before existed at common law, nor does the act profess to do so by its provisions.

It is also claimed that the statute of 1846, page 85, has made a new provision whereby this court is invested with a new jurisdiction. The assumption is without foundation, except that it is a re-affirmance of the statute of 1841. It specially provides that the attorney-general shall be the actor in all proceedings taken by virtue of that act; and is so far an exposition of what the statute of 1841 was. The statute of 1841 was silent as to who the prosecuting officer or agent should be; but this statute renders *that* certain and definite.

If the *corporation* was *in esse* at the time of the filing the bill, then this suit cannot be carried on or maintained for the objects it has in view, in the name and under the direction of the complainants in the bill. See authorities before cited, and also 19 Johns. 456 and 474.

A corporation was *in esse* from the moment one thousand shares were subscribed in the commissioners' books, and one dollar on a share paid ; and the act of incorporation clearly makes that the contingency upon which its formation shall depend.    See second section of the act of incorporation.

By another section the commissioners are bound to issue certificates of stock to all subscribers under their administration, qualified as therein stated.    By another section they are made directors, *pro tempore*, so soon as one thousand shares are subscribed, and are required to perform all the duties of directors until an election shall be held.    There arose the contingency then, so soon as the one thousand shares were subscribed and the money paid, whereby the corporation was formed ; and simultaneously with the happening of such contingency, the commissioners were, of necessity, invested with the franchises of the corporation, and with a new, distinct and executive power and relation as directors.    They might have resigned such office, but they did not ; nor did they accept it, because that would have been an act of supererogation. They became such, by the provisions of the act, when the contingency specified therein happened.    But they did meet and transact business after the contingency happened ; and did give and publish the notice for an election of directors, which latter act could not have been done until the contingency had happened, which made them directors.

There was, then, not only a corporation, with officers who were possessed of its franchises, but also officers who were engaged in acts which were official, and which none others were empowered to perform.    They were, then, *de facto* and *de jure*, directors, and the corporation was in active being.    These commissioners are still officers, as commissioners, and for nothing else, unless there has been elected another set of directors on the notice given for that purpose by them.    They have not been ousted of their office by force, or by any other means, nor could they have been, except by an election, or by

the judgment of a court having jurisdiction for that purpose. Neither of these acts are alleged to have occurred, except the bill states that the acting directors claim to have been elected as such; but no force has been employed. The commission-ioners have voluntarily abandoned all claim to the place. They were possessed of the books, papers and other franchises, which are alleged in the bill to be now in the possession of the defendants, who are acting as directors, and who must be pre-sumed to have acquired the possession of such franchises in a peaceful way, and with their consent; and the contrary is not alleged. There is no alternative but to conclude that an active and legal corporation exists. No matter whether the commissioners, or those who are exercising the functions and are possessed of the franchises, are rightfully in place, for the purpose of the point made here. That fact being established, *the corporation* must be made a party complainant or defend-ant. No stockholder or number of stockholders could take·pro-ceedings in this or any other form to *oust* the directors unless they are, or assume to be such. Nor can that be done by any-body except upon the information of the law officer of the state.

Nor can any stockholder entertain a bill in this court with or without the aid of the attorney-general against a *corporation*, except for the abuse of the trust confided to its care, or for a fraudulent exercise of its franchises.

The moment the corporation was formed, the state became interested in its acts, and the guardian of its common fran-chises, and it will guard and protect its rights, and direct, control, and regulate its operations in the same way that it would any other state interest, for the common good of all. The state created it, and it will unmake it if need be, to sub-serve a public good; and by and through its own officers claims, and will claim to exercise a supervisory power of con-trol. It was upon this basis that the principle came into practice, that the state officer should conduct proceedings as against corporations.

But the bill alleges enough, and the facts therein stated show that a part of the defendants are the directors of the company, and are exercising the functions of such office, and are possessed of the franchises of the corporation—at least to an extent to require proceedings to be instituted against them, to *oust* them of the possession of the franchises, and to terminate the exercise of official functions by them, if they shall be found to have possessed themselves of them without authority and in violation of law.

One in possession of the franchises of a corporation and discharging the duties of, and claiming to be an officer of such corporation, is deemed to be rightfully in possession until the contrary is declared by the adjudication of the courts, under a proceeding by *quo warranto*, by the law officer of the state. This court, then, has no jurisdiction.

The bill is multifarious, both as to the matters stated in it, and also in its prayer.

1. It contains various allegations of fraud on the part of *Blossom, Sweet, Davis, Williams, and others,* to obtain by those acts the power and control of the corporation, and alleging combination as between them.

2. It alleges that *Wells, Ludington, Weeks and Kneeland* also combined and confederated together in making subscriptions to acquire the power and control of the corporation; but that each of the alleged conspirators (that is, each of the combining parties) were acting for themselves disjunctly and without privity, either of action or design. Nay, that the action in that behalf, by *Wells and others,* was a counter plot, antagonistical to that of *Blossom and others,* and having in view to defeat the designs of *Blossom and others,* while at the same time they intended, if successful, to have appropriated to themselves the control of the company's affairs.

The charges in the bill against each of these parties impute fraud, but not any unity or concert of action, as between themselves. Now, if one alleged combining party should have had

one object and purpose in view, and *that* was the prompting motive of their acts, and the other of such alleged combining party should have had another object and motive in view, in their alleged fraudulent acts, we fancy it would not be pretended by any sound lawyer that a joint action could be maintained against both fraudulent actors without showing combination, concert and unity of action. Nor would the case be relieved at all by showing that both conspiring parties had the same purpose in view, but not to be enjoyed in common, and not to be brought about by any joint action.

Two men design to commit murder on a particular individual, but there is no concert. The one effects the object before the other is at hand, or does any overt act. Can the two be convicted of the crime of murder without proof of concert? In this the bill is multifarious, for the cause that two matters and two issues are to be tried, which, though the same, as against the complainant, are not the same in effect, as between all the defendants, and draw in question matters in which both were not actors or privies, as between themselves.

It is multifarious also in another form. The allegations in the bill, as respects the means employed by one of the alleged conspirators, are diverse from those employed by the others, and neither having any connection with the other.

3. The bill prays that the persons (some of defendants) who are acting as directors may be decreed to suspend their acts as such directors, and to yield up and deliver to the defunct " commissioners," *who are a part of the defendants*, the books, papers and corporate franchises which they have in possession.

*This part of the bill and prayer asks for and claims a decree and the action of the court, distinct from that which is asked for, as against the other defendants.*

But what is most singular and anomalous is, that the bill prays that the defendant commissioners, who are charged with acts of wrong in regard to the assumed rights of the complainants, should have a decree in their favor, conferring upon

them " power and place," and restoration to an office which has become extinct.

If it became material to any of the pretended rights of the complainants that the commissioners should be restored to their office, it should have been upon their solicitation, and as complainants in the bill. If it did not so become material, they should not have been made parties at all.

How can the court enforce the action of the commissioners, should this resurrection of a defunct office be decreed to them, or what power has this court over them to compel them to action?

4. This bill is multifarious, both as to parties and objects, inasmuch as it asks for others than the complainants a decree in their favor. It is an absurdity on its face. Besides, it asks for a decree which, in this particular, cannot be ' granted as against the other defendants.

The decree *ousting* one part of the defendants from office is one thing, and the *placing in* office another part of the defendants is another thing. But to do this would be to make distinct and separate decrees as relates to parties holding diverse and opposite interests. If anything can be called multifarious, I think this to be such.

The rule, that a bill is not multifarious where the same decree can be made against numerous parties, though some of them have distinct interests from the others, is violated here, because the decrees asked for are diverse, disjunct, and not affecting the rights and interests of the defendants equally, but in antagonism to each of them.

5. But the bill is multifarious in another particular. It prays, as against *Blossom and others*, who are not acting as directors, a forfeiture and surrender of their subscriptions and stock. This affects those individuals in their pecuniary and personal interests.

It prays of those, or part of those, who act as directors, a like decree, and in addition to that, an annulment of their

office as directors, and hence affecting them unequally and diversely. This cannot be done without transcending the rules of pleading, and is multifarious most palpably and grossly. 5 Paige, 65; 1 Sim. & Stuart, 108; 4 Rand. 74; 5 Conn. 86; Littell's Sel. Cases, 320; Story's Eq., Pl. § 271 to 282; 1 Tur. & Russ. 297.

There is no real equity in the bill set up in behalf of the complainants touching or relating to their pecuniary interests. They do not complain that they have been deprived of all their stock for which they subscribed, nor that they were restrained from subscribing all they chose. They do not pretend that the directors are squandering the franchises of the corporation, or misapplying any of its resources. On the contrary, the bill alleges that they are making contracts for the building of the road and that they intend to build it, and that, for that purpose, they are endeavoring to get and apply to that object the funds belonging to the corporation. This bill does not assume or pretend that, as yet, the directors have possessed themselves of a single dollar of the moneys paid in to the commissioners by the complainants; nor do they in any way impeach the integrity of the defendant directors, in any act they have done or are about to do as directors of the corporation. Nor do they in any way complain of wrong, except that the power of control is vested in others and not in themselves. Personal love of power, and denunciation of its possession by others, is the very heart and soul of their complainings.

Declamations of intention of " personal aggrandizement and fraudulent gain" on the part of the defendants, and such like euphoneous declamation, said and sung throughout the bill, from its address to its *finale*, make up the mighty emptiness with which it abounds, and give a spice of brilliant and poetic beauty which is rarely found in legal papers where wrongs and injuries are detailed or rights asserted. We can well suppose that mortified pride and humbled ambition enter

largely into the creation of this legal engine, the bill. But the best scrutiny which we have been enabled to make of its solid *legal contents*, has not enabled us to discover that wrong has been inflicted or right withheld.

Here was an open corporation, whereto all, from the highest to the lowest, could subscribe for its stock at pleasure, and free of all restraint ; the whole power and control of which might have been secured to the complainants, if their liberality had borne any just proportion to their cupidity. But they feared and doubted and hesitated, lest they might sink a penny instead of gaining it, until the lucky moment passed and the power became vested in other hands. Then envy and hatred, if not malice, incited them to endeavor to 'put an end to the projected improvement, by a suppression of it, through the medium of this bill. It is denied by the defendants that there can exist legal fraud in the case made by this bill, if it were to be regarded as true.

There is no allegation that any one of the complainants made a subscription upon any representation made by any one of the defendants, who had any official pledges which he could give, or believed, if made, and if any assurance had been given was it a *nudum pactum*, and could never be treated, in a judicial sense, as fraudulent, though not performed. Because certain individuals have made large subscriptions and have thereby obtained the power of control, it was their right to acquire it. It was in the power of the complainants to have done the like. What prudent man would embark his funds largely in a joint stock company, unless he knew in what hands its control would be vested. What better right is there of control, in a case like this, where an individual or individuals have a large interest at stake ? We know of none. And unless that control is used to the injury of minor interests, there is no wrong. This bill is not verified so as to give it credence in this court, nor in accordance with the usages and requirements of the court.

No one important statement or allegation in the bill, is alleged upon the personal knowledge of the only complainant, who personally signed and swore to the bill. Those allegations are almost uniformly made upon his " information" only, and in other instances upon his " belief," and in other instances upon his " information and belief." But in no instance does he give the name of his informant; nor is there annexed to the bill any affidavit of any other person from whom he derived his information; nor is there any excuse for not having obtained it. Mere information and belief of a party complainant is insufficient to procure an injunction where it is prayed for in such a bill, because *that* is not the best evidence or *any* evidence of the truth of the facts alleged, to authorize the action of this court. In case the complainant does not know the facts of his own knowledge, he should procure and annex to the bill the affidavit of his informant, of the truth of the matters alleged. 4 Paige, 242; 7 id. 160; 9 id. 315.

I do not assume that on the pending motion this objection can be taken to the extent it could be in resistance of the allowance of an injunction, or on a motion to dissolve an injunction, where one had been improvidently allowed in such a case. But we do assume that if the court would not grant or allow an injunction, on a bill so sworn to, the reason would be, because it imparted no legal, substantial verity whereon the court would grant the summary process of injunction. The same rule will apply on this motion to weaken, though it may not destroy, the efficiency of the bill in its stating matter. The court cannot, if it reads the bill, but see that the party swearing to it could escape a conviction for perjury, regarding almost every allegation made, though the matter of fact should be untrue. He " believes," or " is informed and believes." Though the facts set forth may be *false in fact*, yet who can charge the oath-maker with perjury, as to his belief or his information and belief of their truth ? If the complainant had not made the bill filed by the defendant

*Blossom,* and the proceedings thereon had, evidence in the case of this bill, we could not have used this reasoning in this motion. But that bill was made use of in the case before Judge LARRABEE, and is charged in this bill as having been fraudulently filed, and that the integrity of this court was prostituted in the allowance of the injunction therein prayed for.

The reading of the bill filed by *Blossom* is, therefore, evidence here; and by its own showing, it will be seen whether the bill was filed and the injunction fraudulently obtained to further and aid the "personal aggrandizement and fraudulent gain" of the defendants herein.

If that bill, on its face, presents a case of equity, and that upon *it* this court would have decreed in accordance with its prayer, then the allegation in the bill of the complainants herein is false or mistaken in the particular of its allegations concerning *Blossom's* bill. The bill herein makes *Blossom's* bill evidence.

It must result, that if the court can see a plain case of equity in *Blossom's* bill, it must disregard all allegations contained in the bill herein; because no material fact is alleged in this bill of the acts of *Blossom,* except what appear in the bill itself. If the complainant's bill is impeached by the evidence which itself furnishes, in its own vindication, such evidence operates to impeach its statements in other particulars. "*Falsus in uno, falsus in omnibus,*" applies in this case.

STOW C. J. The bill in this case was filed by the complainants (about twenty in number) for themselves, and all others alleged to be *bona fide* stockholders of the Milwaukee and Janesville Plank Road Company, claiming to hold one thousand shares of the stock, against the defendants, charging certain of them with a combined fraudulent subscription of seven thousand and seven hundred shares, and others of them with a combined fraudulent antagonistic subscription of seven thousand five hundred shares; a fraudulent suing out and

abuse of an injunction from the Milwaukee circuit court, (in which the bill was originally filed), by *Blossom*, in confederacy with the defendants, *Sweet, Davis, Hibbard, Webb* and *Williams*, by which the commissioners appointed by the act of incorporation were restrained from distributing the stock and organizing the company; and that through the instrumentality of that fraudulent process and proceeding, the defendants, *Sweet, Webb, Greeves, Davis, Taylor, Hibbard* and *Chandler*, have possessed themselves of the books and papers of the commissioners (who, until after the election of directors, were, by the act, to be officers of the corporation), and assume to act as the directors and officers of the company. The bill states that the commissioners, obeying the mandate of *Blossom's* fraudulent injunction, have ceased the exercise of their office, and that the complainants and their fellows are the only *bona fide* stockholders of the company; and prays that the alleged fraudulent subscriptions be set aside and declared void; that the pretended organization of the company, by means of the fraudulent use of *Blossom's* injunction, be declared void; that the defendants, assuming to act in the name of the corporation, be restrained from prosecuting certain suits for the collection of the subscriptions, etc.; and that the commissioners be declared, for the time being, the officers of the company, and be reinstated in the possession of its books and effects; and for general relief. The defendants, *Sweet, Davis, Webb, Hibbard, Blossom, Williams, Clark, Green* and *Taylor*, demurred, and assigned as causes of demurrer: 1. That the bill is multifarious. 2. Want of jurisdiction in the circuit court. 3. That the corporation should have been made a party. 4. That the complainants have not a right to prosecute for themselves and fellows.

The circuit court overruled the demurrer as to multifariousness, and sustained it as to the other causes, and dismissed the bill. To reverse this decree the complainants have appealed to this court.

I shall consider the questions arising in the case in the order in which they are presented by the demurrer. But, before doing so, I will dispose of an objection which has been made *ore tenus*, which is, that there is no equity in the bill.

It has been contended on the part of the defendants, that the bill discloses a corrupt agreement between the complainants and the commissioners, to get control of the company by means of a trifling subscription, and to use it for the purpose of private speculation to the injury of the public. I can by no means say that the bill shows the complainants to have acted from public spirit, or in a manner particularly commendable. But, on the other hand, I do not think it shows any such fraudulent agreement or purpose, as to exclude them from a court of equity. Private speculation was, doubtless, with most of them the leading motive ; and the direction of the company was probably regarded as an important element of success. But there was not anything necessarily, or by fair implication, illegal in this, and to close the doors of equity against the complainants for this reason would be in effect to shut out from the court of chancery most stockholders of incorporated companies.

The first cause of demurrer is multifariousness. The bill sets up a general right on the part of the complainants and their fellows against all the defendants, and charges that all the defendants, except the commisioners, claim on fraudulent subscriptions, or by means of *Blossom's* fraudulent injunction ; and that the commissioners have abandoned their duty to the *bona fide* subscribers, in obedience to that injunction. Though the transactions of the several defendants are various, and some of them not necessarily connected, they are all charged (with the exception of the subscriptions of *Weeks, Wells, Ludington* and *Kneetand*) to be the work of one concerted confederacy, and the result of one common scheme to defraud the complainants. The subscription of *Weeks and his associates,*

is alleged to be fraudulent, and to have been made in antagonism to the fraudulent subscriptions of *Blossom and his confederates*, and as it respects the complainants, for the same purpose as theirs—the defrauding the *bona fide* stockholders. The objection now under consideration has been mainly urged on the grounds that the subscription of *Wells and his associates*, so far from having been made in concert with those of *Blossom and his associates*, is shown by the bill to have been made in hostility to it, and that, therefore, no common liability on the part of the two adverse sets of fraudulent subscribers exists. That there was no community between these different and adverse defendants, as it regards themselves, is very clear; but it by no means follows that there is not such a privity in relation to the complainants, that the wrong which they have perpetrated for the same purpose, at the same time, and by the same means, in connection with, though in hostility to one another, may not be redressed by the same proceeding. If two are engaged in the same felony, though they may be hostile to each other, each seeking for himself the sole advantage, they are privies as it regards the crime, and may be prosecuted jointly. Looking at the whole of these transactions, as stated in the bill, and admitted by the demurrer, I am of opinion that there was such a connected, though not confederated fraud, on the part of the defendants as subscribers, that they are properly joined as defendants. It is further contended, that the defendants *Greves* and *Taylor*, not being parties to the original confederacy, and having no connection therewith, ought not to be made defendants, and cannot be required to answer. The bill shows these parties to have come in by means of the operation of the fraudulent injunction, and if so, they are answerable with the original confederates thereto; and besides, the bill specially charges them with combining with *Blossom and his associates;* and as these have not denied, by answer, this charge, they cannot avail themselves of this ground of demurrer.

2. Want of jurisdiction.

In support of this objection, the defendants contend that the bill shows a corporation in existence, and that certain of the defendants are its officers *de facto;* and that being so, they cannot be removed at the suit of private individuals, but must be proceeded against by the government. In the view I take of this branch of the case, it is entirely immaterial whether the corporation is now in actual existence or not. The bill states that, for the purpose of defrauding the complainants and preventing the commissioners from distributing the stock and organizing the company by an election of directors, *Blossom*, in confederacy with his associates, *Sweet, Davis, Hibbard, Webb* and *Williams*, filed a bill, which was false in all its material allegations, against the commissioners, and thereon obtained an injunction restraining them from distributing the stock and holding the election of directors; that the service of the injunction was delayed until the confederates had, by a trick, possessed themselves of their certificates, when, in pursuance of a preconcerted signal, it was served; that the commissioners thereupon abandoned their trust; and that, thereupon, the defendants, *Blossom and his associates*, possessed themselves of the books, etc., and claim to act as the directors and officers of the company; that the confederates having effected their purpose, *Blossom* discontinued his suit; and that the filing of *Blossom's* bill, the procuring the injunction, the fraudulent use made of it, and the discontinuance of the suit, were all parts of the conspiracy to defraud the complainants and deprive them of their rights; and that the injunction was the instrument by which this was effected. In this state of things, the complainants, as the parties in interest in *Blossom's* suit, claim that they have a right to the aid of *that same court*, by the abuse of whose process they are suffering, to relieve them. A claim, in my judgment, so obviously just—so well founded both in legal equity and natural justice—that it needs only to be asserted to be conceded.

The parties complain, not that the defendants have invaded the sovereignty by usurping a franchise, but that they, the complainants, have suffered a private injury, which has been perpetrated by the abuse of the process of a court of equity ; and they ask the *same* court to correct the wrong it has unintentionally committed, by restoring them to the condition in which it found them.   And can it be that such a prayer as this is not to be heard, because, forsooth, the attorney-general does not choose to prosecute for the incidental evasion of the rights of the public ?   I think not.   By the discontinuance of *Blossom's* suit, all things were theoretically restored to the state in which they were at the time of the filing of his bill ; and it was the duty of the circuit court to have so restored them in fact, either by an order in that suit or a decree in this. Had the commissioners disregarded the injunction, and held an election, at which the directors adverse to *Blossom* and his associates had been elected, and who thereby possessed themselves of the franchise, and had *Blossom* prosecuted his bill to a final decree in his favor, would not the circuit court, in vindication of its violated process, have summarily displaced the contumacious intruders ? and would it have listened to a claim on their part, that being in possession of a corporate franchise, they could be ousted only by a *quo warranto ?*   I take it that our circuit courts, made by the constitution superior courts of record, and vested by that instrument with greater powers than were probably ever before, in a free government, delegated to any one tribunal—the united powers of the English King's Bench, common pleas, exchequer and chancery—will never prove themselves so impotent and complacent.*   And if the court would have thus summarily dealt with one set of intruders,

---

* The circuit courts shall have original jurisdiction in all matters, civil and criminal, within this state, not excepted in the constitution, and not hereinafter prohibited by law, and appellate jurisdiction from all inferior courts and tribunals, and a supervisory control over the same.   They shall also have the power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and all other writs necessary to carry into effect their orders, judgments and decrees, and give them a general control over inferior courts and jurisdictions.   Constitution of Wisconsin, art. 7, § 8.

who had defied its mandate, has it not the same power, and ought it not to exercise it, over the adverse set, who have got possession by means of a fraud upon the court itself, and by the abuse of its process?   To disclaim this power, or to withhold its exercise, I regard as a flagrant denial of justice.

It is very certain that had *Blossom's* bill been prosecuted, the court would not have hesitated in that suit to rectify the injury it had been made the instrument of inflicting; these complainants would have had the right of filing an original bill, such as this, in the nature of a cross-bill (*Jones v. Jones*, 3 Atk. 110 ; Hoff. Ch. Pr. 319, 349) ; and the court would not have heard an objection to its jurisdiction to correct its own involuntary wrong.. It is equally certain to my mind, that the mere discontinuance by *Blossom* of his suit could not operate to deprive the court of such jurisdiction.   Parties cannot be tolerated in playing this fast and loose game with the authority and jurisdiction of courts.   The jurisdiction which *Blossom* and his confederates conferred upon the circuit court by the filing of the bill, and the abuse of the injunction, cannot, when they have profited by it, be withdrawn at their pleasure.   It must, of necessity, abide in the court until it has placed the injured parties in as good a situation as it found them.

Again : by the fraudulently suing out and abuse of the injunction, the dignity of the court itself was attacked ; and the inherent power of self-preservation gave it jurisdiction to vindicate itself and its suitors, by its own process.   This is not a question, exclusively, of individual rights ; it involves, to some extent, the character and good faith of the court.   And it is necessary, for the maintenance of that public confidence in the impartial and equal administration of justice so vitally essential to the usefulness of all judicial tribunals, especially in a republic, that such abuses of the power and process of the court as are here disclosed should find a remedy as speedy and as simple as the abuse.   I am, therefore, of opinion that the

circuit court had jurisdiction in this case ; and that the decision of the court, sustaining the demurrer for want of it, was erroneous, and should be reversed.

It will be observed, that in coming to the conclusion at which I have arrived, I have had no reference to the statute of 1841 ; nor do I undertake to decide the general question, whether persons acting as directors of a private corporation, like this Plank Road Company, can be displaced at the suit of the corporators, without the intervention of the government. I have formed my opinion on the peculiar and extraordinary facts disclosed in this case.     I have not searched for authorities, because I have not deemed them necessary ; nor is it probable that any could be found in point ; for it is believed that the nefarious transactions presented on this record are as much without precedent, as it is to be hoped they will be without imitation.

The third cause of demurrer is, that the Milwaukee and Janesville Plank Road Company should have been made a party.

I think the objection a good one.    It is somewhat difficult to say at what precise time, or in what particular stage of its proceedings, this association had, or would have, a legal existence as a corporation ; probably not until its formal organization by the legal election of directors.    The bill, however, shows that it is acting as a corporation and exists *de facto*, and that certain of the defendants claim to be its officers.    This is enough to entitle it to be made a party in this suit.    It has been contended with some plausibility, by the counsel of the complainants, that the corporation, being a mere formal party, is sufficiently before the court in the persons of the commissioners, and of the defendants who claim to be directors.    He says: " The corporators, the complainants, are in court ; the claimants to be corporators by the subscriptions we seek to impeach, are in court ; the commissioners, whom we claim to be the officers, if the corporation is *in esse*,

are in court; the assumed directors are in court; what else is there to bring into court? *Nothing but a name!*" Precisely so. But that name is everything to the corporation; by it alone, it exists and is known; it cannot be described by any synonym or circumlocution; its name is itself; and *eo nomine*, it must appear. The decision of the circuit court, on this point, I think was correct. But as the complainants should have been allowed to amend, by making the corporation a party, the dismissal of the bill for this cause, was erroneous.

The last cause of demurrer is, "that the complainants have no right to sue in behalf of themselves and the other stockholders." The bill alleges that the stockholders, for whose benefit it is filed, are very numerous, and are unknown to the complainants; and shows a case of common right in the complainants and all others whom they represent. A more appropriate case "for some of a large number having a common right to maintain a suit in behalf of themselves and fellows, in aid of that common right," cannot well occur. I think the bill is properly filed by the complainants, for themselves and the other stockholders.

On the whole case my opinion therefore is, that the decree of the circuit court, dismissing the bill, should be reversed, and that the record be remitted to the circuit court with directions to allow the complainants to amend by making the Milwaukee and Janesville Plank Road Company a party defendant. I am further of opinion that the process for bringing in the company should be served on the commissioners as the legitimate officers, and that they should represent the company in the suit.

I add, in conclusion, that I approve of the denial of the injunction by the circuit court. In a case involving such important interests, both public and private, and where delay and interruption must be attended with such serious consequences, an injunction ought not to be allowed until the

defendants have an opportunity of being heard.  *Kipp v. Ogden*, 6 Johns. Ch. 160.

WHITON and JACKSON, JJ., *concurred.*

LARRABEE, J., *dissenting.*   I shall proceed to examine the grounds of demurrer in their order :

1. The bill is said to be multifarious in this, that it is exhibited against the defendants demurring, with *Wells, Weeks, Kneeland* and *Ludington*, for several distinct matters and causes, in many of which the demurrants are not interested ; and that relief is sought by the bill on several distinct matters, to wit : to set aside the subscriptions of the demurrants ; to set aside the subscriptions of *Wells et al. ;* to declare the election of directors void, and to compel the commissioners to proceed and hold an election pursuant to the statute.

The doctrine is now well settled, and the authorities sustaining it are numerous, that where a bill is filed concerning things of distinct natures against several persons, it is demurrable ; but unconnected parties may join and be joined in a suit where there is one connected interest among them all, *centering in the point in issue in the cause.*  5 Madd. 138 ; Story's Eq. 284 ; *Mayor of York v. Pilkington*, 1 Atk. 284 ; *Weale v. Middlesex Water Works Co.*, 1 Jac. & W. 360 ; *Brinkerhoff v. Brown*, 6 Johns. Ch. 139.

Now, let us see how far the cause at bar is open to this charge of multifariousness.   The plaintiffs claim to be the only *bona fide* stockholders of the Milwaukee and Janesville Plank Road Company, having paid one dollar on each share by them subscribed, and charge that the subscriptions of the defendants were made in fraud of their rights, in fraud of the charter, and with the design of fraudulently obtaining control of the company ; that their subscriptions are wholly void for many reasons, but mainly because no money has been paid upon them, as is required by the charter ; that *Blossom* subscribed one hundred thousand dollars, *Sweet et al.* fifty-five thousand

dollars, and *Weeks et al.* one hundred and fifty thousand dollars ; and that *Blossom, Sweet and their friends* entered into a fraudulent combination ; and that *Weeks et al.* made their fraudulent subscription in antagonism to that of *Sweet* and *Blossom ;* and that all the subscriptions were in fraud of the rights of the complainants, *bona fide* subscribers. The bill seeks to establish only one claim of right, which is that the complainants and their associates may be declared the only stockholders in the company, as being the only ones who had *bona fide* made their subscriptions in pursuance of the charter. It seeks to restore them to the position which they occupied prior to the alleged fraudulent acts of the defendants. The object of the bill is certainly a single one, although, in seeking to enforce it, it became necessary to join several as defendants who have separate interests. The defendants also claim to be stockholders in the company, though their subscriptions were made at different times, and for different objects. But I can but think that they have all a common interest, not in each distinct charge or allegation in the bill, but certainly in the point at issue in the cause.

There is no good reason why the rights of all the parties cannot be litigated in one cause, and whenever this is possible, a court of equity, which abhors a multiplicity of suits, will compel all who are interested in the point in issue to be made parties. If the complainants are in fact the only *bona fide* stockholders—have the exclusive right to the franchise, an assertion of that right by a competent tribunal will quiet all other claims. The defendants are all charged with a fraudulent intent in making their subscriptions, and in usurping the franchise of a corporation, though, as between themselves, their acts were in antagonism to each other.

The reason of the rule in relation to multifariousness was founded upon convenience. It would be a hardship to make each defendant answer the whole bill when different and distinct matters were charged, in which he was in no way inter-

ested.    But certainly no such hardship could be urged in this cause.    The only question in this connection is as to the fraud upon the complainants and upon the charter ; this decided affirmatively, there would be no difficulty in reaching all the defendants by one decree.

As to whether the demurrer should be accompanied by an answer denying the combination specially charged, I have no doubt.    The rule is well settled that such answer must be put in to authorize the defendants to demur.    Mitf. Eq. Pl. 181 ; *Landsdown v. Elderton*, 8 Ves. 526.    In *Fellows v. Fellows*, 4 Cow. 682, although an answer was put in with the demurrer, denying combination, yet it was held that the demurrer admitted a knowledge as charged, on the part of all the defendants, of the particular facts upon which the charge of fraud was based.    Indeed, the only distinction is this, that where there is only the general charge of combination, an answer need not be put in ; but where there is a special charge, an answer denying the combination must always accompany the demurrer.    Nor do I conceive the rule to have any the less stringency because several of the defendants charged with the combination have joined in a general demurrer ; for if this were held, the rule in a majority of causes, would be entirely inoperative.

It may be as well to inquire here, before proceeding to the principal question in the cause, whether or not the corporation, at the time of the filing of this bill, was in existence.

The commissioners are appointed in the first place by the charter itself as mere ministerial officers, acting as the agents of the state in receiving subscriptions to the capital stock of a corporation created by the state, under the provisions and restrictions of the charter.    The corporation, it is true, was not created *eo instanti*, but its existence and right to the franchises conferred depended upon the contingency of a specified amount of stock being subscribed, and a specified amount of money paid thereon.

The commissioners were, in the first place, to open books of subscription, in which all persons might subscribe, and become stockholders upon the payment of one dollar on each share. This requirement of payment, was absolute and necessary to all the subscriptions made while the commissioners were acting in their ministerial character. They had no power to receive subscriptions without the payment, and they had no power to change, in the least, the requirements of the charter as to the time when or the amount which should be paid.

But, upon the fact being ascertained that one thousand shares were subscribed, and one dollar on each share actually paid in, the subscribers of such stock, and other persons who should associate with them, were, by the act, declared and created a body corporate and politic, by the name and style of the Milwaukee and Janesville Plank Road Company. I do not suppose it was the intention of the legislature to limit the amount to be received by the commissioners to one thousand shares. The books were opened at different and distinct points; and it would have been the right of any one person to make a *bona fide* subscription of any number of shares— say two thousand—immediately upon their being opened. There might have been one thousand shares subscribed by five hundred other persons; and most, if not all, on the first day. This is not an improbable supposition, for frequently the whole capital stock of similar corporations has been taken in one day. In such case, could the commissioners have refused to issue certificates to each subscriber? Could they have refused to call a meeting of the subscribers, or could they at such meeting have discriminated or selected which holders of one thousand shares should vote and which should not? No. Up to the time they ascertained that, *at least* one thousand shares—not exactly one thousand shares— were subscribed, their powers were merely ministerial—having, in fact, no discretion or power beyond the plain, written

requirements of the charter under which they were acting. But when it was ascertained that the requirement of the charter had been met—that one thousand shares had been subscribed—and one dollar on each share actually paid in, then, by the express words of the charter, they were clothed with all the powers of directors. The corporation was then *in esse* —the legislature saw fit to fully complete its organization, by providing officers for it—and hence, by the charter itself, appointed the commissioners as directors, until the company should elect their successors. It might have been better, it is true, that some more solemn act should have ushered this corporation into existence—that the commissioners should have certified to the governor of the state, and he, under the great seal, have declared the corporation *in esse.* But, as it is, the words of the charter are positive and clear that, *as soon* as one thousand shares are subscribed, then the subscribers are created a body corporate.

It was further contended, in argument, that the charter required only the subscribers to the first one thousand shares to pay one dollar on each share, and that after that amount was subscribed, the requirement was no longer in force. But this construction cannot be sustained. The legislature certainly did not intend making so marked a discrimination against the first subscribers. The object in requiring money to be paid, was plainly to prevent large subscriptions being made for the purpose of controlling the location of the road and the management of the affairs of the company. The charter is granted, not for the exclusive benefit of the stockholders, but for the benefit of the whole state. The road is to be located, not with reference to the private interests of individuals, but with regard to the good of the whole community. There is often an issue between the interests of the public and those of individuals. Property is to be enhanced in value by the location of the *termini*; and this would, no doubt, be a sufficient inducement to large subscriptions, made for this mere purpose.

Then, too, important rights are vested by this charter—the right of taking private property—claimed to be justified, I suppose, in this charter of a territorial legislature, under the provision in our *state constitution* allowing private property to be taken for the *pnblic use*—for the use of the state, or its public political agents. Much stress was laid, in argument, upon the sentence, "with such other persons as shall associate with them (the subscribers of the one thousand shares) for that purpose," as carrying the idea that others were joined with them, and were excluded from the restriction of payment. But I think the argument gains nothing from this phrase. The subscribers of the one thousand shares, together with all persons who should subscribe with them, their successors and assigns, "for that purpose"—for *the* purpose of enjoying the franchises of the corporation—were created a body corporate and politic. In other words, the act did not merely incorporate the subscribers to the one thousand shares, but they and all others who should associate with them for the purposes intended by the charter—for the construction of the road.

The bill is framed upon the theory that no corporation is as yet *in esse* (with a clause, however, in. the alternative), charging that its organization by the election of directors, in the proper manner and by the persons having the legal right under the charter to vote, has been prevented by the fraudulent acts of the defendants. But it follows, from the view just presented, that the corporation, being *in esse*, should have been made a party to the bill. *Robinson v. Smith*, 3 Paige, 222 ; *Verplanck v. M. Ins. Co.*, 2 Paige, 438, and cases there cited.

Upon these questions I concur with the majority of my brethren. The want of the company as a necessary party could have been easily remedied by amendment, and the cause proceeded ; but the bill was dismissed, in the court below, upon the ground of jurisdiction. This is the most interesting question presented by the cause, involving not only the construc-

tion of a somewhat loose and indefinite statute of our own state, but the examination of the broad ground of equity jurisdiction.

Proceeding upon the ground that the corporation is *in esse*, and that the defendants have fraudulently usurped its franchises, there is no doubt but at law the only remedy would be by *quo warranto*. Courts of equity have, through a long train of decisions, established their jurisdiction over corporations charged with a misapplication of funds—regarding them as trusts, also treating them as partnerships, and in very many cases upon the ground of fraud—commencing with the celebrated declaration of Lord HARDWICKE, in *The Charitable Corporation v. Sutton*, 2 Atk. 400–406, and running through all the decisions down to our own day. Had a bill been filed against the commissioners, charging them with an abuse of their trust, there would have been no difficulty in the case ; but here we have a much more intricate bill, bringing before the court many parties having distinct interests, though growing out of the same subject-matter, and all interested in the point at issue in the cause. The bill, if amended by making the corporation a party, then seeks in effect to oust certain persons who are publicly acting as directors.

The statute of 1841, p. 36, is in the following words :

" Sec. 1. That courts of equity shall have power to declare the charter of any corporation to be forfeited for any just cause, and shall possess and are hereby vested with the same power upon the subject of corporations that is possessed by courts of common-law jurisdiction."

This statute gives distinctly to courts of equity the same power to declare the charter of a corporation forfeited, for any cause that would work a forfeiture if proceeded against at law. If the act had stopped here, there would be no difficulty in its construction ; for the bill would have to be exhibited by the attorney-general. This construction is aided by the act of 1846, p. 85, giving the attorney-general the right to exhibit

a bill against any corporation, and the court power to restrain it by injunction from assuming or exercising any franchise, liberty or privilege not allowed by the charter ; or to declare the charter forfeited for insolvency, misuser or non-user. So also in case of the usurpation of a franchise ; a court of equity would have power to oust the usurpers upon a similar proceeding. But the act proceeds in the same connection to vest courts of equity "with the same power upon the *subject* of corporations that is possessed by courts of common-law jurisdiction." Now, at law, in the absence of a statute giving the power to a court of equity, in the case of the usurpation of an office or franchise, the only remedy would be by information by the attorney-general on behalf of the state.

The bill shows that certain of the defendants have assumed to act as directors of the corporation, that *Chandler* is acting as secretary, and that they have fraudulently usurped its name and franchises. Here, then, are persons acting publicly as officers of a corporation, and they must be presumed to be rightfully in office. The bill is exhibited by individuals, seeking to oust them and substitute others in their stead. They claim an invasion of a mere private right, and do not call in the aid of the state to vindicate her own honor or to redress their grievance. Will the latter clause of the act of 1841 authorize this proceeding ? I think not. In the absence of a statute expressly giving the power, I see no distinction in the books between the remedy in the case of the usurpation of a franchise and the other cases, which demand the interference of the government or its law officer.

In the common case of a corporation usurping powers not granted, the remedy is always by information. Is there any distinction between the usurpation, by the corporation itself, of some franchise not granted, and the entire usurpation of the name and franchises of a corporation by unauthorized individuals ? Is the breach of the law and public policy any greater in one case than in the other ? Is not the fraud as

flagrant in one as in the other ?    I can see no distinction.    In either, the injury to the private right is merged in the insult and injury to the state.

In the absence of the acts of 1841–6, in either case, the only remedy would be by information by the law officer of the government ; and with those acts I see only a right given to him to come into a court of equity, where the remedy can be more simple and speedy than at law.                                •

It is upon this ground that I thought the bill should be dismissed ; not that there was no equity in it, for if the allegations are true, there cannot be a cause more clearly requiring the salutary powers of a court of equity.    It being admitted that the corporation is *in esse*, that certain persons are publicly exercising its offices, and using its corporate name, I think the grave question is fairly presented of the right of private persons to proceed in a court of equity to oust the acting officers of a corporation.    But the majority of the court have seen proper to waive all consideration of this question, and express no opinion upon it, sustaining the bill entirely upon the ground that the court acquired jurisdiction in this particular cause, because of the fraudulent use of its powers in a different cause by the defendant *Blossom*.    That that suit ought to have been retained by the court for the purpose of vindicating its own integrity, and, if possible, righting the wrongs of these complainants, I have no doubt.    But because of the fraud of *Blossom* in suing out his injunction, the court thereby became possessed of the power to entertain a distinct bill, filed by individuals, to oust those publicly acting as officers of a corporation, I do not believe.    Perhaps I might have believed it, had there been any authority produced to sustain the position, or any argument had, either in the court below or in this court.

HUBBELL, J., *dissenting*.    I cannot concur in either the reasoning or conclusions of the decision.

1. Because the bill, as I understand it, contains no equity. It sets out with a statement, on the part of the complainants, of their design, by a subscription of one thousand shares and the payment of one thousand dollars, to secure in their own hands an election of directors, and the sole control of the corporation. It admits that they apprehended an intention by the defendants and others to make subscriptions to a greater amount, and that they were induced by a denial of such intention to become subscribers, and that they believed "that as soon as the required number of one thousand shares of the said stock should be subscribed for, so that the said commissioners could proceed to organize the said company, the said books of subscription to the capital stock of the said company would be closed, and the said commissioners would at once proceed to organize the said company, *to be composed of the said subscribers of such·one thousand shares*, by calling an election of a board of directors of the said company, in pursuance of the provisions of the said act of incorporation."

It further sets forth that they had a "resolution," or express promise of the board of commissioners to that effect, and that, had they known of certain further subscriptions to the stock, "they would not have become subscribers to the capital stock, or have paid the sum of one dollar on each share thereof to the said commissioners."

These, then, were the objects and inducements—I should rather say this was, the bargain between the complainants and a majority of the commissioners, for it is nothing less—on which their subscriptions were made, and the equitable interference of this court is invoked to protect them. To say the least of the matter, it was a speculating transaction, in which the public had no concern. The state grants corporate franchises for public purposes; but when such franchises are converted, as in this instance, into mere instruments of private gain, courts of equity cannot lend their aid to secure the objects of either party. Parties coming into court for such

purposes, stand upon the old rule, "*in pari delictu, potior est conditio defendentis.*"

The court should spurn the invitation to become a party to a mere scramble for the control of a corporation which was created with a capital stock of three hundred thousand dollars, and which was attempted to be seized upon and appropriated by a few individuals by a subscription of one-tenth part of its capital stock and by the payment of one-three hundredth part of the money.

For these reasons, on the complainants' own showing, I think the court below ought to have dismissed the bill.

2. Because the decision is not consistent with itself. If the corporation is organized and in existence, as the majority of the court hold it to be, then the defendants are its officers *de facto*, prosecuting the work, and exercising all the powers conferred by the charter, under color of law. The bill asks this court not only to take away their corporate property, but to oust them from their offices, and abrogate all their corporate rights.

I do not believe a court of chancery has inherent original power to make such a decree in any case; much more, on the complaint of individuals, without the aid of the state. This principle was settled, if anything ever can be settled, in the case of the *Attorney General v. The Utica Insurance Company*, 2 Johns. Ch. 386. It is sufficient to say that it was never before claimed or exercised in Wisconsin, however much the profligacy of corporate bodies may have provoked the restraining power of courts of chancery.

The statutes of Wisconsin, passed in 1841 and 1846, confer on this court, in my judgment, whatever right or power, and all the right or power it possesses over public grants of franchises, and over officers and bodies assuming to exercise corporate rights, under color of law. Without stopping to discuss the nature or extent of the powers conferred, I desire only to say here, that I think, by the express terms of the

statutes, this court can only exercise those powers when called upon by the attorney-general, in a proceeding on behalf of the state, or of parties concerned.

And when this court makes the use or abuse of its process by individuals, *in another case*, the pretext for the exercise of powers not inherent in itself or conferred by the statute, it overrides justice and abrogates law.

But again : if the corporation is not organized and in legal existence, as the bill maintains, then, on the case made by the bill, there is no impediment to the legal action of the commissioners in the prosecution of their duties under the act.

The *Blossom* bill has long since been withdrawn, and all the parties to it are liable at law, for all the frauds and perjuries which they are alleged to have committed to the complainants. Not only, then, have the complainants ample and perfect legal means of redress, but the commissioners are fully authorized to call an election of directors, by the legal stockholders, without the aid of this court, and all the powers and privileges of the franchise await their acceptance. Why, then, shall we assume a doubtful power for a questionable purpose, at the bidding of those whose hands, to say the least of it, are not clean ?

In conclusion, then, whether I assume the decision to be correct, contrary to the bill, or the bill to be correct, contrary to the decision, on neither horn of the dilemma can I hang a reason for reversing the decree of the court below. I think on principle and authority it ought to be affirmed, and this appeal dismissed.