## 232   SUPREME COURT OF WISCONSIN,

Motion to admit Miss Lavinia Goodell to the Bar of this Court.

In the Matter of the Motion to admit Miss Lavinia Goodell to the Bar of this Court.

CONSTITUTIONAL LAW.   *Women not admitted to the bar of this court.*

1. Whether the constitution of this state, by vesting the whole judicial power in the courts therein provided for, does not entrust the rule of admission to the bar, as well as of expulsion from it, exclusively to the discretion of the courts, *quære*.

2. To entitle any person to practice in this court, the statute requires that he shall be licensed by its order, and no right to such an order can be founded on admission to the bar of a circuit court. Tay. Stats., ch. 119, §§ 31–33.

3. The language of the statute relating to the admission of attorneys (which declares that " *he* shall first be licensed," etc.) applies to males only; and the statutory rule of construction, that " words of the masculine gender *may* be applied to females," " unless such construction would be inconsistent with the manifest intention of the legislature " (R. S., ch. ·5, sec. 1), cannot be held to extend the meaning of this statute, in view of the uniform exclusion of females from the bar by the common law, and in the absence of any other evidence of a legislative intent to require their admission.

4. There is nothing in the statutes of this state providing for the admission of females to the state university which shows a legislative intent to require the admission of females to the bar.

On the 14th of December, 1875, *I. C. Sloan, Esq.*, moved the court for the admission to the bar of this court of Miss R. Lavinia Goodell, and read to the court a certificate of the clerk of the circuit court for Rock county in this state, which stated that at a term of said court begun and held on the 17th of June, 1874, Miss Goodell was examined in open court, and that, it appearing that she was a resident of this state, more than twenty-one years of age, of good moral character, and possessed of sufficient legal knowledge and ability, she was duly admitted by said court as an attorney and counselor at law.   *Mr. Sloan* argued substantially as follows: *

* *Mr. Sloan* desires to have it stated that the argument read by him on the hearing of this motion was prepared by Miss Goodell. — REP.

Tay. Stats., 1343–4, §§ 31–33 (which are the same as secs. 1–3, ch. 189, Laws of 1861), are in these words:

"§ 31. No person shall hereafter be admitted or licensed to practice as an attorney of any court of record in this state, except in the manner hereinafter provided.

"§ 32. To entitle any such person to practice as such attorney in the circuit courts of this state, he shall be first licensed by order of one of the judges thereof, made in open court; and no such order shall be made until the person applying for such license shall have first been examined in open court, by the judge thereof, or examiners by him appointed, as to his learning in the law and ability to practice as such attorney, nor until such judge shall be satisfied that such person possesses sufficient legal knowledge and ability to entitle him to practice as such attorney, nor unless such person be a resident of this state, more than twenty-one years of age, and of good moral character. His residence and age must be made to appear by his affidavit.

"§ 33. Any person licensed by order of the court, as provided by section two of this act [§ 32], shall be entitled to practice as attorney of any court of record of this state except the supreme court; and to entitle any person to practice as attorney in the supreme court, he shall first be licensed by order of such court."

There is nothing in these provisions which can be construed to debar a woman from a license under them, unless it be the use of the masculine pronoun. But, by statute relating to the rules of interpretation, "every word importing the masculine gender only may extend and be applied to females as well as to males." Tay. Stats. p. 181; R. S., ch. 5, sec. 1, pl. 2. This rule of interpretation is followed in the construction of all the statutes; and there appears no reason why it should not be applied to the particular statute under consideration, as well as to the statutes generally. It has been so applied to the statute providing for notaries public, and defining their duties,

under which Miss Goodell has been appointed and now holds the office of notary.

Nothing appears, then, in the laws of the state tending to disqualify an applicant for admission to the bar, in consequence of her sex; and there is no rule of this court modifying the statutes in that respect.

The supreme court of Illinois, in their opinion delivered in September, 1869, upon the application of Mrs. Bradwell, held that the admission of women to the practice of law was without precedent, unknown to the common law, and not within the thought and intention of the legislature at the time the statute providing for the admission of attorneys to practice was enacted. The court say: "When our act was passed, that school of reform which claims for woman participation in the making and administering of the laws had not arisen, or, if here and there a writer had advanced such theories, they were regarded rather as abstract speculations than as an actual basis for action.   *   *   *   In view of these facts we are certainly warranted in saying that when the legislature gave to this court the power of granting licenses to practice law, it was with not the slightest expectation that this privilege would be extended equally to men and women. Neither has there been any legislation since that period which would justify us in presuming a change in the legislative intent." Whatever may be said of the applicability of this argument to that case, it is wholly inapplicable to this. The statute of Illinois providing for the admission of attorneys was enacted in 1845, or earlier, being found in the revised statutes of that state for 1845. The statute of Wisconsin here cited was enacted in 1861, when progressive ideas concerning the enlargement of the sphere of woman's industries were more widely known and adopted, and so may reasonably be presumed to have been within the minds of the legislators at the time of its enactment. But further legislation in this state clearly indicates that, whatever the intention of the

legislators in 1861 might have been — if other than that expressed by plain and unequivocal language,— their subsequent intention has been to include women in the provisions made for the admission of attorneys to practice in all the courts of record in this state. By ch. 17 of 1867, women are admitted to every department, except the military, of the state university, " under such regulations and restrictions as the board of regents may deem proper." Tay. Stats., 521. This statute admits women to the law department of the university, with the privilege of pursuing the course of study marked out for its students, and of graduating from that department. Whether the clause, " under such regulations and restrictions as the board of regents may deem proper," gives said board power to exclude women from the full legal course and the privilege of graduating, or not, it certainly gives them power to allow to women students such full course of study and graduation, if they see fit to do so. Now, by the laws of 1870, ch. 79, sec. 1, " all graduates from the law department [of the state university] shall be entitled to admission to the bar of all the courts of this state, upon presenting to the judge or judges thereof a certificate of such graduation." Tay. Stats., 1344, § 36. Thus, by express legislative enactment, women may be admitted to the bar of all the courts of this state by graduating from the law department of the state university. Can it have been the intention of the legislature to give the board of regents of the university the power to admit women to the practice of law in this court, and at the same time to withhold that very power from the court itself? Again, the statute provides for the admission of attorneys from the state of Illinois and other states, under certain restrictions which do not apply to the question of sex. See Tay. Stats., 1344–5, §§ 39, 40. Accordingly women may be admitted to this bar from Illinois and other states in which they are now or may hereafter become practicing attorneys. If the courts of other states have power to procure the admit-

tance of women to the bar of this state, are its own courts deprived of such power? Again, the constitution of this state, art. VII, sec. 20, provides for the conduct of suits by a party, or his attorney or agent. Under this clause of the constitution no court would have the right or power to refuse a woman, as a party or agent, the right to conduct a suit in court on her own behalf or that of her principal.

Upon application made in 1869 to the supreme court of Illinois, Mrs. Bradwell was refused admittance, October 6, 1869, on the sole ground that she was a married woman, and as such was incapable of making contracts. Ch. Legal News of Feb. 5, 1870. Mrs. Bradwell filed an argument, the most pertinent point in which was that, by statutes enacted by the legislature of Illinois in 1861 and 1869, giving to a married woman the right to hold property in her own name, to control her own earnings, and to sue and be sued, the disabilities asserted by the court to exist, had been removed, and could no longer form a barrier to her admission to legal practice. The court, in a subsequent opinion, while still denying Mrs. Bradwell's application, refused it no longer on the ground of her disabilities as a married woman, but solely on the ground of her being a woman. While virtually admitting that nothing in the language of the statute precluded the admission of women, the court laid down this rule: "In all other respects [aside from the limitations of the statute], it is left to our discretion to establish the rules by which admission to this office shall be determined. But this discretion is not an arbitrary one, but must be held to at least two limitations. One is, that the court shall establish such terms of admission as will promote the proper administration of justice; the second, that it should not admit any person or class of persons who are not intended by the legislature to be admitted, even though their exclusion is not expressly required by the statute." No argument was made upon the first limitation enumerated, and

the refusal to admit the applicant was based solely upon the second.

None of the arguments urged in opposition to the claim of Mrs. Bradwell for admission apply to this case. The applicant·here is not a married woman, and is under no disabilities. But even if she were married, the recent legislation of Wisconsin, giving to married women the right to control their own property and earnings and to sue and be sued, removes their disabilities to contract, as in the case of similar legislation in Illinois, and so removes the barrier supposed to have existed, to her admission to legal practice. See Tay. Stats., 1195-6, and decisions there cited; Laws of 1850, ch. 44; Laws of 1855, ch. 49; Laws of 1872, ch. 155. The inapplicability to this case of the argument upon which the *second* refusal was based, has already been shown.

One of the limitations to the discretion left by legislation to the court, as specified by the supreme court of Illinois, was, " that the court shall establish such terms of admission as will promote the proper administration of justice." No argument was made against the admission of women under this head; and it is submitted that " the proper administration of justice " would be better promoted by the admission of women to the practice of law than by their exclusion, for these reasons among others:

1. That a class wholly unrepresented in courts of justice can never obtain full justice in such courts; and that when that class is so numerous as to include one-half the human race, the promotion of " the proper administration of justice " requires that they be represented.

2. That a union of the peculiar delicacy, refinement, and conscientiousness attributed to woman, with the decision, firmness, and vigor of man, are not only desirable but necessary in promoting " the proper administration of justice " in our courts.

3. That in excluding woman from the practice of law, an injustice is done the community in preventing free and wholesome competition of the best existing talent.

4. That a great injustice is done to one-half the community, by shutting them out arbitrarily from an honorable and remunerative field of industry, for which many of them have both taste and ability.

Besides the case of Mrs. Bradwell, the only known decision apparently adverse to the admission of woman to the practice of law, is that of Mrs. Belva Lockwood, who was refused admission to the court of claims, Washington, D. C., in 1874, solely on the ground of her disabilities as a married woman. See Ch. Leg. News, May 23, 1874.

The following precedents are in favor of the admission of women:

Iowa. — In 1869, Mrs. A. A. Mansfield was admitted to the bar of Iowa under a statute providing that "any white male person," with the requisite qualifications, should be licensed to practice; by virtue of the statute providing that "words importing the masculine gender only may be extended to females;" and the court held that the affirmative declaration that male persons may be admitted, is not an implied denial of the right to females. See Ch. Leg. News, Feb. 5, 1870, Mrs. Bradwell's case.

Missouri, under a statute providing that "any person" possessing certain qualifications, "may be licensed," admits women to all courts of the state, including the supreme court. Miss Barkalow's case, Ch. Leg. News, April 3 and April 9, 1870.

Michigan, under a statute using the word "citizen" as the statute of Wisconsin uses "person," admits women to practice.

Under a statute of Maine similar to that of Wisconsin, a married woman, Mrs. C. H. Nash, was admitted to the supreme court of that state in October, 1872. See Ch. Leg. News, Oct. 26, 1872; R. S. Maine, p. 597, sec. 18.

District of Columbia.— Miss Charlotte E. Ray was admitted on graduating from Howard University, about 1873.

The federal district court of Illinois admitted Miss Hewlitt. See Ch. Leg. News, May 23, 1874.

The federal district court of Iowa has also admitted a woman.

Illinois and Iowa have provided by special legislation for the admission of women, on its appearing a question of doubt whether previous statutory provision was intended to include them.

Ohio provides for the admission of any person complying with certain specified regulations. I understand that a woman has been admitted under this statute, but cannot give reference.

RYAN, C. J. In courts proceeding according to the course of the common law, a bar is almost as essential as a bench. And a good bar may be said to be a necessity of a good court. This is not always understood, perhaps not fully by the bar itself. On the bench, the lesson is soon learned that the facility and accuracy of judicial labor are largely dependent on the learning and ability of the bar. And it well becomes every court to be careful of its bar and jealous of the rule of admission to it, with the view of fostering in it the highest order of professional excellence.

The constitution makes no express provision for the bar. But it establishes courts, amongst which it distributes all the jurisdiction of all the courts of Westminster Hall, in equity and at common law. *Putnam v. Sweet*, 2 Pin., 302. And it vests in the courts all the judicial power of the state. The constitutional establishment of such courts appears to carry with it the power to establish a bar to practice in them. And admission to the bar appears to be a judicial power. It may therefore become a very grave question for adjudication here, whether the constitution does not entrust the rule of admis-

sions to the bar, as well as of expulsion from it, exclusively to the discretion of the courts.

The legislature has, indeed, from time to time, assumed power to prescribe rules for the admission of attorneys to practice. When these have seemed reasonable and just, it has generally, we think, been the pleasure of the courts to act upon such statutes, in deference to the wishes of a coördinate branch of the government, without considering the question of power. We do not understand that the circuit courts generally yielded to the unwise and unseemly act of 1849, which assumed to force upon the courts as attorneys, any persons of good moral character, however unlearned or even illiterate; however disqualified, by nature, education or habit, for the important trusts of the profession. We learn from the clerk of this court that no application under that statute was ever made here. The good sense of the legislature has long since led to its repeal. And we have too much reliance on the judgment of the legislature to apprehend another such attempt to degrade the courts. The state suffers essentially by every such assault of one branch of the government upon another; and it is the duty of all the coördinate branches scrupulously to avoid even all seeming of such. If, unfortunately, such an attack upon the dignity of the courts should again be made, it will be time for them to inquire whether the rule of admission be within the legislative or the judicial power. But we will not anticipate such an unwise and unbecoming interference in what so peculiarly concerns the courts, whether the power to make it exists or not. In the meantime, it is a pleasure to defer to all reasonable statutes on the subject. And we will decide this motion on the present statutes, without passing on their binding force.

This is the first application for admission of a female to the bar of this court. And it is just matter for congratulation that it is made in favor of a lady whose character raises no personal objection: something perhaps not always to be looked for

in women who forsake the ways of their sex for the ways of ours.

The statute provides for admission of attorneys in a circuit court upon examination to the satisfaction of the judge, and for the right of persons so admitted to practice in all courts here except this; but that to entitle any one to practice in this court he shall be licensed by order of this court. Tay. Stats., ch. 119, §§ 31, 32, 33. While these sections give a rule to the circuit courts, they avoid giving any to this court, leaving admission here, as it ought to be, in the discretion of the court. This is, perhaps, a sufficient answer to the present application, which is not addressed to our discretion, but proceeds on assumed right founded on admission in a circuit court. But the novel positions on which the motion was pressed appear to call for a broader answer.

The language of the statute, of itself, confessedly applies to males only. But it is insisted that the rule of construction found in subd. 2, sec. 1, ch. 5, R. S., necessarily extends the terms of the statute to females. The rule is that words in the singular number may be construed plural, and in the plural, singular; and that words of the masculine gender may be applied to females; unless, in either case, such construction would be inconsistent with the manifest intention of the legislature.

This was pressed upon us, as if it were a new rule of construction, of peculiar application to our statutes. We do not so understand it. It appears to be but a particular application of the general rule thus stated by TINDALL, C. J: "The only rule for the construction of acts of parliament is, that they should be construed according to the intent of the parliament which passed the act." And it is not new or peculiar here. Potter's Dwarris, 111. The last clause of the rule, relating to sex, seems to be almost as old as Magna Charta. Coke, 2 Inst., 45. We apprehend that, unless in the construction of penal statutes, it has been little questioned since the

much considered case of *King v. Wiseman*, Fortescue, 91. The rule is permissive only, as an aid in giving effect to the true intent of the legislature. Even of a statutory rule positive in terms, Lord DENMAN said: "It is not to be taken as substituting one set of words for another, nor as strictly defining what the meaning of a word must be under all circumstances. We rather think that it merely declares what persons may be included within a term, when the circumstances require that they should." *Queen v. Justices, etc.*, 7 A. & E., 480. So, *a fortiori*, of the permissive rule here.

And the argument for this motion is simply this: that the application of this permissive rule of construction to a provision applicable in terms to males only, has effect, without other sign of legislative intent, to admit females to the bar from which the common law has excluded them ever since courts have administered the common law. This is sufficiently startling. But the argument cannot stop there. Its logic goes far beyond the bar. The same peremptory rule of construction would reach all or nearly all the functions of the state government, would obliterate almost all distinction of sex in our statutory *corpus juris*, and make females eligible to almost all offices under our statutes, municipal and state, executive, legislative and judicial, except so far as the constitution may interpose a virile qualification. Indeed the argument appears to overrule even this exception. For we were referred to a case in Iowa, which unfortunately we do not find in the reports of that state, holding a woman not excluded by the statutory description of "any white male person." If we should follow that authority in ignoring the distinction of sex, we do not perceive why it should not emasculate the constitution itself and include females in the constitutional right of male suffrage and male qualification. Such a rule would be one of judicial revolution, not of judicial construction. There is nor sign nor symptom in our statute law of any legislative imagination of such a radical change in the economy of the

state government. There are many the other way; an irresistible presumption that the legislature never contemplated such confusion of functions between the sexes. The application of the permissive rule of construction here would not be in aid of the legislative intention, but in open defiance of it. We cannot stultify the court by holding that the legislature intended to bring about, *per ambages*, a sweeping revolution of social order, by adopting a very innocent rule of statutory construction.

Some attempt was made to give plausibility to the particular construction urged upon us, founded on ch. 117 of 1867, and ch. 79 of 1870. It was represented that the former admits women to every department of the university, excepting the military only, and so necessarily including the law department; that the latter directs admission to the bar of the graduates of the law department; that the legislature had thus provided for the admission of female graduates of the law school, and ought therefore to be understood as intending the admission of women under the general statute. If the legislature had so provided for the admission of female graduates, we do not perceive how that could aid the construction of the general statute, or this lady, who does not appear to be a graduate. But, unfortunately for the position, the statutes were not stated with the fair accuracy which becomes counsel, and do not support it.

The act of 1867 is an amendment of sec. 4 of the act of 1866, reorganizing the university. The section of 1866 provided, without qualification, that "the university in all its departments and colleges shall be open alike to male and female students." The section of 1867 substitutes the provision, that "the university shall be open to female as well as male students, under such regulations and restrictions as the board of regents may deem proper." In both statutes, the section provides that all able bodied male students shall receive military instruction, and makes no other reference to a

military department. And the argument that the admission of females under the statute of 1867, to all departments except the military, necessarily contemplated their admission to the law department, falls to the ground, because the statute neither mentions all departments nor excepts the military — if there be a military — department.

The inaccuracy is the more striking from the fact that the section of 1866 does expressly include all departments and colleges, and the amendment of 1867, evidently *ex industria*, omits them. The change of an absolute right of admisssion to all departments and colleges of the university in 1866, to admission to the university under discretionary regulations and restrictions of the regents in 1867, is very significant; the more so that it is the only amendment made. It seems likely that the legislature came to regard the absolute and indiscriminate right of 1866 as dangerously broad, and to consider it necessary to make the right subordinate to the judgment of the regents. And if the law school had then been established by statute, it would be very doubtful whether the admission of females to it would be sanctioned by the act of 1867. But there was no such statute; and the law school was in fact established, not by statute, but, as we learn, by the authorities of the university, some time in 1868, after the enactment of the section in both forms. The first class of students, all males, graduated in 1869, without color of right to practice. Hence the statute of 1870, to give the right, presumably passed without thought of the admission of females to the bar. And the general argument for this motion takes nothing by these statutes.

So we find no statutory authority for the admission of females to the bar of any court of this state. And, with all the respect and sympathy for this lady which all men owe to all good women, we cannot regret that we do not. We cannot but think the common law wise in excluding women from the profession of the law. The profession enters largely into

the well being of society; and, to be honorably filled and safe-
ly to society, exacts the devotion of life.  The law of nature
destines and qualifies the female sex for the bearing and nur-
ture of the children of our race and for the custody of the
homes of the world and their maintenance in love and honor.
And all life-long callings of women, inconsistent with these
radical and sacred duties of their sex, as is the profession of
the law, are departures from the order of nature; and when
voluntary, treason against it.  The cruel chances of life some-
times baffle both sexes, and may leave women free from the
peculiar duties of their sex.  These may need employment,
and should be welcome to any not derogatory to their sex and
its proprieties, or inconsistent with the good order of society.
But it is public policy to provide for the sex, not for its
superfluous members; and not to tempt women from the
proper duties of their sex by opening to them duties peculiar
to ours.  There are many employments in life not unfit for
female character.  The profession of the law is surely not
one of these.  The peculiar qualities of womanhood, its gen-
tle graces, its quick sensibility, its tender susceptibility, its
purity, its delicacy, its emotional impulses, its subordination
of hard reason to sympathetic feeling, are surely not qualifi-
cations for forensic strife.  Nature has tempered woman as
little for the juridical conflicts of the court room, as for the
physical conflicts of the battle field.  Womanhood is moulded
for gentler and better things.  And it is not the saints of the
world who chiefly give employment to our profession.  It
has essentially and habitually to do with all that is selfish and
malicious, knavish and criminal, coarse and brutal, repulsive
and obscene, in human life.  It would be revolting to all
female sense of the innocence and sanctity of their sex, shock-
ing to man's reverence for womanhood and faith in woman,
on which hinge all the better affections and humanities of
life, that woman should be permitted to mix professionally in
all the nastiness of the world which finds its way into courts

of justice; all the unclean issues, all the collateral questions of sodomy, incest, rape, seduction, fornication, adultery, pregnancy, bastardy, legitimacy, prostitution, lascivious cohabitation, abortion, infanticide, obscene publications, libel and slander of sex, impotence, divorce: all the nameless catalogue of indecencies, *la chronique scandaleuse* of all the vices and all the infirmities of all society, with which the profession has to deal, and which go towards filling judicial reports which must be read for accurate knowledge of the law. This is bad enough for men. We hold in too high reverence the sex without which, as is truly and beautifully written, *le commencement de la vie est sans secours, le milieu sans plaisir, et le fin sans consolation,* voluntarily to commit it to such studies and such occupations. *Non tali auxilio nec defensoribus istis,* should juridical contests be upheld. Reverence for all womanhood would suffer in· the public spectacle of woman so instructed and so engaged. This motion gives appropriate evidence of this truth. No modest woman could read without pain and self abasement, no woman could so overcome the instincts of sex as publicly to discuss, the case which we had occasion to cite *supra, King v. Wiseman.* And when counsel was arguing for this lady that the word, person, in sec. 32, ch. 119, necessarily includes females, her presence made it impossible to suggest to him as *reductio ad absurdum* of his position, that the same construction of the same word in sec. 1, ch. 37, would subject woman to prosecution for the paternity of a bastard, and in secs. 39, 40, ch. 164, to prosecution for rape. Discussions are habitually necessary in courts of justice, which are unfit for female ears. The habitual presence of women at these would tend to relax the public sense of decency and propriety. If, as counsel threatened, these things are to come, we will take no voluntary part in bringing them about.

*By the Court.* — The motion is denied.