Davis, J.
All along the way through this proceeding the respondent has challenged the jurisdiction of this court to try. him upon the alleged offenses. By motion, demurrer and answer he has asserted the lack of jurisdiction. His theory is, as disclosed .by the brief filed in support of the motion and demurrer, that the supreme court has and can have no original jurisdiction except such as is conferred in the constitution, Article IV, Section 2; and that, for that reason, Section 563, Revised Statutes, which expressly recognizes the original jurisdiction of the supreme court in disbarment proceedings, is unconstitutional and void. It is evident that this ■ reasoning, if valid, would disqualify the supreme *653 court and effectually prevent both it and the circuit court (constitution, Article IV, Section 6). from protecting themselves, the bar,, or the public, except by appellate jurisdiction. It is not surprising that such logic should appeal to one who is charged with transgression. • •
Numerous authorities, English, Federal and State, assert such jurisdiction as inherent in every court of record as a necessary incident of its organization as a court; and that it especially, although not- exclusively, results from the power to admit to the bar; and that such original jurisdiction exists even in courts of appellate jurisdiction. We cite some of the cases in point. In re Durant, 80 Conn., 140; points held are more fully stated in the syllabus of the same case, 67 Atl. Rep., 497; In re Davies, 93 Pa. St., 116; People v. Goodrich, 79 Ill., 148; Bradley v. Fisher, 13 Wall. (U. S.), 335; Ex parte Wall, 107 U. S., 265; In re Duncan, 64 S. Car., 461; Fields v. State, 18 Tenn., 168; Brooks v. Fleming, 65 Tenn., 331, 337; In re Whitehead, 28 Ch. Div., 614; People v. Green, 7 Colo., 237; Ex parte Brown, 1 How. (Miss.), 303.
The power of any court to protect itself from contempts is generally conceded. At least it was held by this court in Hale v. State, 55 Ohio St., 210, that such power is inherent and necessary to the exercise of judicial functions; and that it is not within the authority of the general assembly to abridge such power as to a court created by the constitution. The power to punish for contempt is not more completely involvedjn the constitution of the courts, nor is it more necessary in the due administration of justice than is the power to see that none but persons of legal learning, integrity and *654 respectful demeanor, and, generally speaking, of good moral character, shall be permitted to assume the functions of an attorney at law, and thereby, as officers of the court, assist in dispensing justice. By such sanction of the court, an attorney is held out to the public as worthy of their confidence and respect. Hence, whenever it is made to appear to the court that an attorney is no longer worthy of the trust and confidence of the public and of the courts, it becomes not only the right but the duty of the court which made him one of its officers and gave him .the privilege of ministering within its bar, to withdraw the privilege. Therefore it is almost universally held that both the admission and the disbarment of attorneys-are judicial acts; and that one is admitted to the bar and exercises his functions as an attorney not as a matter of right, but as a privilege conditioned on his own good behavior and the exercise of a just and sound judicial discretion by the court. In re Durant, 80 Conn., 140; Bradwell v. Illinois, 16 Wall. (U. S.), 130; In re Day, 181 Ill., 73.
The provisions of Section 563, Revised Statutes, are not an attempted enlargement of the jurisdiction of the several courts named, in contravention of the constitution; but are regulative provHons recognizing already existing powers of those courts. State, ex rel., v. Harber, 129 Mo., 271; In re Breen, Sup. Ct. of Nevada, 1908, 93 Pac. Rep., 997; Cooper v. People, 13 Colo., 337; In matter of Mills, 1 Mich., 392; In matter of Goodell, 39 Wis., 232, 240; Nelson v. Commonwealth (Ky., 1908), 109 S. W. Rep., 337; In re Smith, 73 Kans., 743, 748-749. A very instructive case is In re Simpson, 9 N. Dak., 379, from which we quote the follow *655 ing: “A preliminary motion was made to quash this proceeding upon the ground that this court is denied original jurisdiction to entertain it under Sections 86 and 87 of the state constitution. We are entirely clear that a disbarment proceeding is not within the spirit and meaning of the constitutional inhibition contained in the sections referred to. The power to discipline attorneys, who are officers of the court, is an inherent and incidental power in courts of record, and one which is essential to an orderly discharge of judicial functions.. To deny its existence is equivalent to a declaration that the conduct of attorneys towards courts and clients is not subject to restraint. Such a view is without support in any respectable authority and cannot be tolerated. Any court having the right to admit attorneys to practice, and in this state that power is vested in this court, has the inherent right in the exercise of a sound judicial discretion, to exclude them from practice. The statutory provision found in Section 432, Revised Codes, authorizing this court to suspend or disbar an attorney for unprofessional conduct is merely a legislative affirmance of a power which already existed. In support of the foregoing see Ex parte Wall, 107 U. S., 265; In re Mills, 1 Mich., 392; People v. Ford, 54 Ill., 520; In re Secombe, 19 How. (U. S.), 9; In re Garland, 4 Wall., 333, and numerous cases cited in 6 Enc. Pl. & Pr., on pages 711 and 712.
“It is also well settled that an appellate court possesses the power by an original proceeding to suspend or disbar an attorney for unprofessional conduct in a lower court. So also a state court may discipline counsel for unprofessional acts committed in the federal courts". On this point see *656 cases cited in 3 Am. & Eng. Enc. L. (2 ed.), pages 300 and 301, and note, and this inherent power in the judiciary cannot be defeated by the legislative or executive departments.”
Counsel for respondent place considerable emphasis on In re Waugh, 32 Wash., 50; but this case is practically overruled' in In re Robinson, decided by the same court December 26, 1907, and reported 92 Pac. Rep., 929.
We do not think it necessary to say more, or to cite further authority on the matter of jurisdiction. We think, for the reasons stated, that "we have full original jurisdiction over the subject matter of this proceeding; and that considering the unsettled state of the law in this state and the peculiar circumstances of this case we are entirely warranted in exercising jurisdiction without being in any way under obligation to do so in every case which may be brought to our notice.' We have entertained the present case with the intention to be absolutely fair to the judiciary and the public interest on the one side and the respondent on the other, and we believe that we have not failed in that reg'ard.
We come now to the consideration of the merits of the charges preferred against the respondent. We are unanimous in our findings of fact upon the several specifications and it will serve no good purpose to discuss the evidence in detail. What we do say is with reference. to the bearing of the facts' as found upon the proper judgment to be rendered. In not entertaining Specification 15 we do not wish to be understood as holding that the facts therein stated show nothing that is reprehensible, but that it discloses a want of decorum which could have been adequately taken *657 care of at the time by the court in whose presence the conduct of the respondent occurred. In regard to Specification 13, the whole matter appearing upon the face of the depositions, the trial court might have properly disposed of it by striking the depositions from the files, without resort to anything more severe. As to Specification 16, the evidence of Mattison and the respondent discloses a conflict as to the understanding of the parties in regard to the contract, or as to whether there was any contract at all; but it does not show that the respondent was not acting in good faith, under the belief that Mattison was trying to cheat him out of his just rights. There was some testimony tending to sustain Specification 18, but the evidence did not sustain the specification as a whole. Specifications numbers 17, 14, and 1 to 12, inclusive, are found to be sustained and we will consider them in the order in which we have mentioned them.
Specification No. 17 in substance recites that the respondent, Thatcher, for the purpose of procuring for himself a large sum of money caused an'action to be begun in the name of Albert Reiter against George R. Hudson when the notes had long-before been paid by Milburn and the respondent knew they had been paid; and that the respondent thereby attempted to impose upon the court and practice fraud upon Hudson. The evidence would indicate that Milburn and Hudson were co-sureties of the note to the First National Bank of South Bend and joint makers on the Reiter notes. Consequently if they were paid by Milburn as alleged the only right of action which would remain would be an action by Milburn against Hudson for contribution. .This right of action Milburn did not see fit for various *658 reasons to exercise. The bank note was paid on or before March 29, 1900, by the bank accepting as payment certain life insurance policies which Milburn had theretofore deposited as collateral. Later, in May, 1900, Milburn obtained the Reiter notes by giving for them certain notes signed by one Murray, amounting to two thousand dollars and secured by eighty shares of the capital stock of The Toledo Tubrtlar Axle Company, par value four thousand dollars. At this time the Murray notes were past due and The Tubular Axle Company was in the hands of a receiver. Thatcher conducted the negotiations by which these transactions were consummated and he thereby came into possession of the original notes. The right of action upon those notes in favor of Reiter and the bank was extinguished. Reiter never sued upon the Murray notes, but received a dividend of $245.76 upon the stock which he held as collateral. On July 1, 1902, Thatcher wrote to Milburn ánd called his attention to the contract by which Milburn was to receive one-third of the amount of claims placed in Thatcher’s hands for collection, up to $2,250, and two-thirds of that sum was to be retained by Thatcher, together with any balance over $2,250. Lie then continues as follows: “I believe with a considerable effort something can be realized on the Reiter notes and on the note given to the South Bend bank. More can be done if the notes are sued upon in the name of Reiter and the bank. In order to get Reiter and the bank to allow the suits to be brought in their names, they will no doubt rec[uire a portion of the amount recovered to be paid to them. I am willing to give a portion of the amount to which I will be entitled, provided you are also *659 willing to do the same. I consider our agreement of March 9th still in force; but desire to co-operate as to the manner in which it will be carried out.”
Passing over a number of letters which passed between Milburn and Thatcher, we come to one dated February 7, 1903, in which occurs the following: “Mr. Reiter called a few days ago to learn whether there was a prospect of his getting anything more on his notes. I asked him if he would allow the use of his name providing he got fifteen or twenty per cent, of the amount realized. Pie seemed willing to do this, although it was hard for me to make him thoroughly understand what I desired to know but I trust he did understand me. I think it will be much better to have the suit brought on the First National Bank note in the name of the bank if you can make satisfactory arrangements.” Then follows, under date of February 13, 1903, the following letter from Milburn: “I enclose herewith an assignment for the Reiter notes. The First National Bank of South Bend-would not bring suit, consequently I make no assignment of that.” On the following day Thatcher answered Milburn as follows: “Yours of the 13th containing an assignment of notes to Albert Reiter, received. The assignment recites the fact that you have paid Reiter in full for the two notes and assign your right to sue Hudson as a signer of the note and assign anything he may collect. I fear that this will cause complications, so that it would be claimed by Pludson that if you have paid Reiter for the notes his (Reiter’sI interest in them has ceased. Hudson w-11 then claim that anything to which you are entitled is off set by claims which he has against you, and therefore your assignment *660 to Reiter of the right to sue on the notes will allow Hudson to bring in his set-offs. In other words, Hudson will have the same defense against Reiter that he would have if you brought the suit. Would not a better way be for you to sign a statement to the effect that whereas you have made an exchange of certain notes given to you by one Murray for the notes held by Reiter and at the time of the exchange it was represented to Reiter that a considerable sum could be collected on said note, but that it had afterwards been found that such was a mistake, and it being the desire of both parties to cancel such agreement of exchange, you therefore do by the instrument named re-convey to said Reiter all rights which you acquired by reason of such transfer and he in turn conveys to you the Murray notes.” Milburn answered, under date of February 18, 1903 : “Answering your favor of the 14th, will say that I am willing to sign any paper that will enable Reiter to get any amount of money •he can out of Hudson, but I am not willing to sign any paper that will make me liable again for notes that I have paid him for.” Thatcher writes to Milburn April 4, 1903: “I feel that something should be done in the Reiter matter and explained to you in a former letter that it will be impossible for Reiter to sign the papers stating that he has been paid the note in question and at the same time commence an action to enforce payment ag'ainst one of the makers,” etc. On September 21, 1903, Thatcher writes to Milburn: “Enclosed I send you a new draft of agreement, which, if satisfactory you might send to Mr. Knapp for his signature. It will become necessary for me to employ associate counsel and I can see a disagreeable fight *661 ahead before anything can be recovered.” The Mr. Knapp referred to in this letter is the father-in-law of Milburn. September 23, 1903, Milburn wrote to Thatcher: “Answering your favor of the 21st, will say that I am not willing in any way to have Mr. Knapp mixed up in a law suit, conser quently I do not send paper on for his signature; neither am I willing to be mixed up in a law suit, preferring to attend to my own business, and let whatever I might be able to get as my share even though it amounted to over $2,000 go with the balance. I should like very much indeed to know that Albert Reiter had been paid in full, and would be willing to sign a paper assigning thesé claims to him, if the assignment could and would be worded in such a way that I would not be again held*liable to Reiter or any one else in case of failure to be satisfied with whatever was collected. If you will draw up such an assignment and send to me I will sign it with this provision, and that is that Reiter is to receive ten per cent, in the collection indicated in the assignment that you have sent me, and the fort3>--five per cent, that I was to receive, making his share fi^-five per cent, and your share forty-five per cent. ■ In sending this to me, enclose the three notes with it.” March 22, 1904, Milburn wrote to Thatcher as follows: “You can readily understand that I will not sign any papers which can in any way make either Mr. Knapp or myself liable in the future, and unless papers can be drawn fully protecting both of us I will not sign any, neither will I ask him to. And in drawing up a contract, make it explicit that forty-five per cent, of the collection is yours and that you are to pay every expense of whatever nature connected with *662 the collection.” And again, on September 9, 1904, Thatcher writes to Milburn: “I think it best that you have your own attorney draft such papers as are necessary to be signed by Mr. Knapp transferring the Hudson notes to Reiter. In fact, I think those notes are already indorsed without recourse, and can be transferred by delivery. If you will consent to my proceeding in Reiter’s name I will do so, and not ask for any paper at all.”
We cannot undertake to analyze thoroughly all the evidence upon this subject, but we think that this correspondence, with other testimony, conclusively shows that Milburn, the bank and Reiter regarded ' the original notes as paid; and that Thatcher knew that they were paid and that a suit by Milburn against Hudson for contribution would probably be fruitless. But as against the bank and Reiter, Hudson would have no defense if he were deceived into believing that the notes had never been extinguished by payment. Thatcher failed in his scheme to induce the bank to sue, but by promising to pay a poor and ignorant German blacksmith ten per cent, of the amount to be recovered he prevailed upon him to ignore the payment of the notes and to appear as the real party in interest. And concealing his own interest in the matter, he induced a reputable attorney to institute the action and verify the pleadings. “The lawyer’s duty is of a double character. He owes to his client the duty of fidelity, but he also owes the duty of good faith and honorable dealing to the judicial tribunals before whom he practices his profession. He is an officer of the court — a minister in the temple of justice. His high vocation is to correctly inform the court upon the law and the facts of the case and *663 to aid it in doing justice and arriving at correct conclusions. lie violates his oath of office when he resorts to deception or permits his clients to do so. He is under no obligation to seek to obtain for those whom he represents that which is forbidden by the law.” People v. Beattie, 137 Ill., 553. In short, we are of the opinion that the evidence submitted under specification No. 17 fully sustains the charges. The whole affair is a striking' example of the peril to his integrity which a lawyer invites when he speculates in a law suit upon a large contingent fee and of the strain which, under the circumstances, he puts upon himself while struggling with his honor upon the one side and cupidity upon the other. We have here a vivid illustration of the proverb of Solomon:, “He that maketh haste to be rich shall not be innocent.”
The facts stated in specifications Nos. 1-12, inclusive, and No. 14, are in no material part disputed; but, on the contrary, are admitted in the answer. Some additional facts are brought out in the evidence and these will be referred to hereafter. The facts stated in Specification No. 14 standing alone would probably not have been regarded as sufficient to sustain the charges; but the respondent’s own testimony, in the opinion of a majority of the court, adds materially to the gravity of the specification. From that it appears that some personal feeling was engendered beween the respondent and Judge Morris some time before the date mentioned in Specification No. 14. It occurred in this way: The respondent had a client who was plaintiff against a railroad company. This client was not a resident of this state and is not to be presumed to have knowledge of the laws of Ohio, *664 Judge Morris never had seen him and knew nothing of him; but from seeing the judge while trying a personal injury case against a railroad company respondent’s client did not want his case tried before Judge Morris. At that time the statute did not permit counsel to swear to affidavits of prejudice. Respondent seems to have advised his client to swear to an affidavit of prejudice and took it upon himself to interview the judge at his residence. Naturally the judge was indignant at the suggestion that he could entertain a bias against a man whom he did not know and never had seen. Respondent then criticised the judge’s conduct in some other case and they separated. Afterward, it would seem, when the statute had been changed so as to permit attorneys to swear to affidavits of prejudice, the respondent habitually filed affidavits of prejudice for the removal of his cases from Judge Morris’ docket. We gather from the whole testimony that this course resulted more from prejudice of the respondent against the judge than from any bias of the judge against respondent’s clients or any conduct of the judge which justified the inference of any bias against the attorney which seriously affected his cases. So that when we come to look at the option suggested to the judge through the deputy clerk, as alleged in the specification, in the light of the facts detailed by both parties, it does not appear to be so innocent and considerate as it might be regarded on the face of it. We are, therefore, inclined to take this transaction, as well as those detailed in Specifications 1 to 12, inclusive, as showing that the respondent was acting throughout in a vengeful spirit and with .a determination to defy Judge Morris and through him to serve notice on other judges *665 that they would have to reckon with him if they exercised their own judgment instead of adopting his notions of what would be proper and right. It is true that he alleges in his answer, and re-asserts it in his testimony, that he was acting throughout as a disinterested citizen, pro bono publico; but it would require further proof to establish this, in view of his own statement in Exhibit “C,” viz.: ■“’But the attorneys who try the suits against the big corporations are against Morris to a man. It isn’t sentiment or politics with them. It .is business. They never would be against Morris if he were ‘a people’s judge.’ ” Whether he wrote these words or not, he made himself responsible for them by distributing these circulars; and the peculiar methods of publishing them and the time at which it, was done made them all the more inflammatory and dangerous. With a trumpeter and an automobile and the crippled Gravell, he went about gathering curious crowds and giving out harrowing stories of corruption, oppression and injustice wrought in the name of law. Some of them were not even half truths. For instance, “The deadly parallel” of seventy-one cases, of which fifteen were personal injury cases, all of which were reviewed and but two. reversed, and the attacks on Judge Kumler in exhibits “B” and “C,” as to which there is not even an attempt at explanation, excuse or defense.
The chief stress of the defense has been upon the claim that what the respondent did, and he denies very little, he did as a citizen and not as an attorney; and that as a citizen and an attorney he had the right, and it was his duty, to oppose a candidate whom he believed unfit for office. We concede that it is the duty of the bar to aid the public *666 in the selection of proper persons for the bench; but that duty should be exercised in subordination to another duty, which is -thus expressed in the code of ethics adopted by the American Bar Association * : “It is the duty of the lawyer to maintain towards the courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free tq defend themselves, are peculiarly entitled to receive the support of the bar against unjust' criticism and clamor. Whenever there is proper ground for serious complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities. In such cases, but not otherwise^ such charges should be encouraged and the person making them should be protected.” This obligation is usually understood to be implied in the attorney’s oath and therefore he cannot assail the judge in the violent and disrespectful manner which is admitted here without a breach of his oath. If the judg'es who were attacked in these circulars were believed by the respondent to be guilty as he charges and insinuates it was his privilege and duty to do what he could to have them impeached so that they might be deposed from office, when found guilty. As an attorney, or as a citizen, he had the right to criticise the judgments and conduct of the judges in a decent and respectful manner ; but no man has a right at any time to degrade and intimidate a public officer and bring his office into contempt by the publication of libelous matter imputing to him impeachable offenses, and the fact that the officer is a candidate for re-election does not remove the ban.
*667 Whether an attorney can divide his personality so as to be an attorney at one time and a mere citizen elector at another, is not the important question here. The real question is whether under the facts admitted'and proved the respondent appears to be a fit person to be longer allowed the privileges of an attorney. In re Durant, 80 Conn., 140, 67 Atl. Rep., 497; State v. Morrill, 16 Ark., 384. The question is not whether' his offense might be punished as a contempt or by prosecution for libel, nor in what capacity he was acting. It is whether he has shown himself, by lack of appreciation of ethical standards and by unworthy conduct, to be no longer worthy of being recognized as an officer of the courts.
The rancor of personal feeling appears in almost every line of the publications issued by the respondent. The views of this c'ourt as to the effect of such publications is very well indicated in the following extract from a per curiam opinion in Myers v. State, 46 Ohio St., 489: “The article was a libel upon the presiding judge, but that alone did not form the basis of the information. The intention of the publication was to insult and intimidate the judge, degrade the court, destroy its power and influence, and thus to bring it into contempt; to inflame the prejudices of the people against it; to lead them to believe that the trial then being conducted was a farce and wrong on the part of the judge and other officers of the court, and, if communicated to the jury, to prejudice their minds, and thus prevent a fair and impartial trial. Besides, the tendency was, when read by the judge, to produce irritation and to a greater or less extent, render him less capable of exercising a clear *668 and impartial judgment. It therefore tended directly to obstruct the administration of justice in reference to the case on trial and its publication was a contempt of court.” Much of this language is just as pertinent to libelous publications relating to matters no longer pending in the courts as to those still pending.
In'this connection it is proper to say that in order to justify a court in disbarring an attorney it is not necessary that his offense should constitute a contempt or a crime; or that he should be con-, victed of the crime or contempt before disbarment. “The obligation which attorneys impliedly assume, if they do not by express declaration take upon themselves, when they are admitted to the bar, is not merely to be obedient to the constitution and laws, but to maintain at all times the respect due courts of justice and judicial officers. This obligation is not discharged by merely observing the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts. * * * Whatever may be thought, in such a case, of the power to punish for contempt, there can be no doubt of the existence of a power to strike the offending attorney from the roll,” Bradley v. Fisher, 13 Wall., 335, by Mr. Justice Field. “No question can be made of the power of a court to strike a member of the bar from the roll for official misconduct in or out of court,” Ex parte Steinman, 95 Pa. St., 220, by Chief Justice Sharswood. “The power of the court to punish for contempt by fine and imprisonment is one thing, and its power to strike an attorney from the roll is another and distinct thing, *669 although the misconduct for which an attorney may be disbarred may in some instances involve a contempt of court,” Beene v. The State, 22 Ark., 151, by Chief Justice English. “Where the crime, the commission of which is charged, is unconnected with the professional conduct of the attorney, a previous indictment and conviction are in general necessary to warrant disbarment; but this requirement is not inflexible, and the courts will sometimes proceed without conviction.” 3 Am. & Eng. Ency. of Law (2 ed.), 304.
Nor can the respondent be justified on the ground of guaranteed liberty of speech. When a man enters upon a campaign of vilification he takes his fate into his own hands and must expect to be held to answer for the abuse of the privilege extended to him by the constitution. An attorney of more than twenty years’ standing at the bar must be presumed to know the difference "between respectful, fair and candid criticism, and scandalous abuse of the courts which gave him the high privilege, not as a matter of right, to be a priest at the altar of justice.
The respondent has admitted no fault. He has insisted upon his right to say and do that which he did say and do. He has -assumed an attitude of defiance even in the face of this court. He has expressed no regret and made not even a suggestion of an apology. In view of all this and the facts as they appear to us we feel compelled to' go to the logical result.
In Scouten’s Appeal, 186 Pa. St., 270, Mr. Justice Mitchell said: “The bar have great liberty and high privileges in the assertion of their clients’ rights as they view them, but, on the other hand, *670 they have equal obligations as officers in the administration of justice, and no duty is more fundamental, more unremitting or more imperative than that of respectful subordination to the court. The foundation of liberty under our system of government is respect for the law as officially pronounced. The counsel in any case may or may not be an abler or more learned lawyer than the judge, and it may tax his patience and his temper to submit to rulings which he regards as incorrect, but discipline and self-restraint are as necessary to the orderly administration of justice as they are to the effectiveness of an army. The decisions of the judge must be obeyed because he is the tribunal appointed to decide, and the bar should at all times, be the foremost in rendering respectful submission.” In Ex parte Wall, 107 U. S., 265, it was said in the opinion that: “The provisions of the constitution, which declare that no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, and that the trial of all crimes, except in cases of impeachment, shall be by jury, have no relation to the subject in hand. As held by the supreme court of Tennessee in Fields v. The State (and the same view is .expressed in other cases), the constitutional privilege of trial by jury for crimes does not apply to prevent the courts. from punishing its officers for contempt, or from removing them in proper cases. Removal from office for an indictable offense is no bar to an indictment. The proceeding is in its nature civil, and collateral to my criminal prosecution by indictment. The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of jus *671 tice from the official ministration of persons unfit to practice in them. Undoubtedly, the power is one that ought always to be exercised with great caution; and ought never to be exercised except in clear cases of misconduct, which affect the standing' and character of the party as an attorney. But when such a case is shown to exist, the courts ought not to hesitate, from sympathy for the individual, to protect themselves from scandal and contempt, and the public from prejudice, by removing grossly improper persons from participation in the administration of the laws. The power to do this is a rightful one; and, when exercised in proper cases, is no violation of any constitutional provision.” In People v. Green, 7 Colo., 237, the court said: “But courts ought not to forget, in their anxiety to shield the attorney, the duty they owe themselves, to the legal profession in general, and to that portion of society with whom they directly deal. This case cannot be determined as a single controversy between two individuals; the questions are of general importance and application. Every other judge and every other lawyer is almost as much interested as are relator and respondent. Individuals are lost sight of; the issue tried bears directly upon the relations existing between the bench and bar of the entire state.” In In re Murray, 11 N. Y. Supp., 336, the supreme court of New York in general term, in a case in which the respondent charged the court with corrupt practices, in an affidavit, used the following language, which appears to us to be just as applicable, for our present purpose, to the case at bar: “The charges are most serious in character and would be attended with the gravest results if established. They should not, *672 therefore, be entertained for a moment, except upon the most impressive evidence at least, and then only in the manner provided by law for the investigation of kindred accusations against judicial officers. These results impose the greatest and most scrupulous care even in an attempted impeachment of a judical officer, and if a counselor of this court, disregarding that mode ' of procedure, makes the charge, of corruption against an officer in his own court, while sitting in a case which he is investigating, his conduct is in the highest degree unprofessional and improper. If such a performance should be tolerated, when every presumption of law is ag'ainst the truth of the accusation, the honor of judicial officers would be exposed to the malice or rage of disappointed attorneys whose evil inclinations, anger, or passion, would thus seek its gratification. Unfortunately, perhaps, there are in our profession a few who chafe under an adverse decision, and indulge in utterances which they are only too happy to retract in cooler moments; and this class are unfortunate, it may be, in having adopted a profession which has its successes and failures, the latter arising doubtless more from the infirmities of human evidence than the uncertainty or variability of legal principles. Here the respondent for the oral declaration against the surrogate was given the opportunity to apologize, which he failed to do, and in this proceeding has given neither signs of regret at his conduct nor retracted, apologized, nor stated anything in extenuation or in mitigation. * * * We think it our duty to grant the motion made herein forever disbarring the respondent as an attorney or counselor of this court.”
*673 The counsel for the respondent say that, “Many would say that a humble citizen might safely follow the leadership of such distinguished men as President Lincoln * * * and the opinion of former judge now President Taft”; and they quote at large from the address of the latter before the American Bar Association, August 28, 1895, and from speeches of Mr. Lincoln severely criticising the Dred Scott decision. Again we say that there is a broad distinction between fair and temperate criticism and abuse or slander of the courts or judges constituting them. Mr. Lincoln was not guilty of the latter offense nor did Judge Taft approve it. And nobody knows better than a lawyer, that while judicious criticism is a necessary and effective means when used to keep the judges mindful of their duties and to prevent the selection of inefficient judges when judges are chosen by the people; yet when carried beyond the limit of truth and fairness nothing is more certain to destroy the judicial balance of timid judges and to effectually impair the impartial administration of justice.
The judgment of the court is that the respondent be

Disbarred.

Crew, C. J., Summers, Shauck and Price, JJ., concur.
Spear, J.
At the inception of this inquiry I was of opinion, which has not been changed, that the matter could be tried by one of the courts of Lucas county with less expense than in this court, and, considering that error would lie to a judgment so obtained, with equally conclusive results. ■ That course would have proved a material saving of the *674 time of this court, for, while we have spent practically a week in the trial, an error case from a court of Lucas county, embodying the same record, could have been heard in a few hours at most, and the week spent on this trial could have been profitably given to the hearing of pressing cases on the docket having precedence. Not that I had or have doubts as to the legal right of this court, whether called the exercise of jurisdiction or of inherent power, to entertain and act upon the charges, but it seemed to me that this would be better practice and would avoid any possible claim that this court had, by entertaining this case de novo, established a burdensome precedent. For these reasons I favored sustaining the motion of the defendant to commit the controversy to one or the other of the Lucas county courts, the power of the circuit court to act upon such complaints, having been twice affirmed by this court, once as far back as the year 1893 (Palmer v. The State, from Fayette county), and again some years later in a similar case from Cuyahoga county. But a majority, for reasons by them deemed sufficient, thought that the motion should be overruled. I am aware that this question of practice does not affect the merits of the case, but I regard the point as of sufficient importance to justify this statement of my position upon it; and I am authorized to say that Crew, C. J., was of the same opinion with respect to the granting of the motion, and concurs in the foregoing.
It results that we have the case and it is to be determined, as other controversies in the courts are determined, upon the law and the evidence. At the opening of the trial specification No. 15 was *675 dismissed by order of the court. In my judgment specifications numbered 13, 14, 16 and 18 are not sufficiently supported by evidence and proper conclusions to be drawn therefrom to warrant any action by this court, and may properly be ignored. As to the other specifications I am satisfied that they are sufficiently sustained, and do sufficiently establish the charge of misconduct in office to make it the duty of the court -to take action thereon. I do not, however, feel that the proper discharge of that duty requires a judgment of disbarment. I am disposed to somewhat temper justice with mercy, to make some allowance for the frailties of our nature, to which we are all more or less subject, and to give opportunity for reflection and correction, and for that reason, and taking into account all the circumstances presented by the evidence, am of opinion that a suspension from practice for a reasonable time, definite as to date, would, so far as that feature of the case is concerned, sufficiently vindicate the majesty of the law, .and serve as a warning to others. I therefore do not concur in the judgment as rendered. I do concur in the syllabus except as to the sixth paragraph as applied to this case.